MaddeN, Judge,
delivered the opinion of the court:
The plaintiff is a non-profit educational institution approved for the training of veterans under the act of March 24, 1943, 57 Stat. 43, known as Public Law 16, and the act of June 22, 1944, 58 Stat. 284, known as Public Law 346. It furnished laboratory coats to its veteran students, billed the United States, through the Veterans Administration (VA), for them, and the bills were paid. Later the United States required the plaintiff to refund the money.
A private bill for the relief of the plaintiff was introduced in the United States Senate, providing for the repayment of the money, $17,259, to the plaintiff. The Senate passed a resolution referring the bill to this court for proceedings pursuant to sections 1492 and 2509 of Title 28 of the United States Code.
The plaintiff school required its students to wear laboratory coats when working in certain of the laboratories. Students who were not veterans had, of course, to provide their own laboratory coats, just as they had to provide their own books and pay their own tuition. The Government, under the statutes cited above, paid for the tuition and books of the veteran students. The Government’s agent, the VA, *777 had the authority to pay for such student equipment as the laboratory coats. But it had a discretion as to where to draw the line as to the kinds of student equipment which the Government would pay for.
Public Law 16 provided for the training of disabled veterans. Under that statute the VA made formal contracts with the schools. It had such contracts with the plaintiff from September 7, 1944 to August 31, 1951. The contracts extending down to June 30, 1946 expressly provided for the payment by the VA for laboratory coats as uniforms. The subsequent Public Law 16 contracts made no mention of laboratory coats or of uniforms. They did provide for the payment for student supplies up to a stated maximum per year.
The great majority of the veteran students were not disabled veterans. The non-disabled veterans were trained under Public Law 346. Under that statute the VA did not make contracts with the schools. Operations were carried on according to the statute and the rules written and administered by the VA.
In submitting its bills to the VA the plaintiff, like other schools, put in a lump sum for supplies, without listing details. However, it maintained supply sheets, which the veterans signed showing the receipt of the supplies. On these supply sheets for the years 1944-1945 and 1945-1946 the laboratory coats were designated as “uniforms.” After December 1946, they were designated as “protective garments.” The reason for the change was that the VA on October 3,1945 wrote a letter to its regional offices prescribing certain administrative standards which should be used in fixing the line beyond which payments for supplies would not be made. This letter said that since the Government paid to each veteran a subsistence allowance out of which he was supposed to buy his clothes as well as to pay his rent and buy his food, therefore uniforms worn in place of ordinary clothes, even though the school required them to be worn, would not be paid for. The letter said:
Consequently, gymnasium clothing, laboratory coats and trousers, nurses’ or technicians’ uniforms, school or military uniforms, coveralls and other similar articles will *778 not be provided, notwithstanding the fact that it may be a requirement of the training establishment that clothing of a certain type or style shall be worn by all students or employees.
The letter further stated that articles worn primarily for the purpose of protecting the wearer from physical harm, as distinguished from protecting his clothing, would be paid for.
A VA representative advised the dean of the plaintiff school of the contents of the letter. The dean said that the laboratory coats were worn primarily for the purpose of protecting the wearer from harm. The VA representative would have had no opinion as to that, and probably said that if that was so the coats should be designated as “protective garments” on the supply sheets. The school continued to include the cost of the laboratory coats in its lump sum bills for supplies, and, as we have said, the VA paid the bills.
We think the dean was right in classifying the laboratory coats as protective garments. The body of a student working in a laboratory would be well protected from casual spat-terings of acids or other chemicals if he kept on his $50 suit of clothes. But it would be foolish for him to do so if he would be equally well protected by a $2.50 smock. Hence, when we put him in the laboratory, we assume that he has sense enough to take off his expensive coat. Having taken off his coat, which he had better do if he hopes to clothe himself respectably within his fairly meager VA subsistence allowance, we find his body unprotected. We require him to wear a smock, not primarily to protect his shirt, which he may also have removed if the weather or the state of his finances recommended that, but primarily to protect his body. Granted, his $50 suit would have protected him as well, or better. A $50 overcoat on top of the suit would have protected him still better. None of these coverings would have protected him as well as an impervious apron, but they would protect him from casual spatterings and annoying small burns. A garment, in order to be protective, need not be adequate to protect against disasters.
The contents of the VA letter of October 3 to its staff were substantially repeated in a Veterans Administration *779 technical bulletin dated February 28, 1947, a copy of which was mailed to the plaintiff. Subsequent similar regulations were mailed to the plaintiff. The plaintiff continued to furnish the laboratory coats to the veterans without charge, included their cost in its lump sum bills for supplies, and received payment for them, until March 1951. At that time a contract officer of the VA inspected the school’s books and records. The staff of the VA in the Boston area was not large enough to enable it to make this detailed kind of inspection sooner. After the inspection, the VA declared that all payments that had been made to the plaintiff for laboratory coats constituted overpayments, and must be repaid to the Government. The plaintiff sought administrative relief from the General Accounting Office, but that office denied relief. The plaintiff thereupon repaid the $17,259 to the Government.
As indicated above, we think the garments in question were protective garments. But the VA letter in 1945, and its official bulletin in 1947 expressly named laboratory coats as articles which the VA would not pay for. That meant that they were not protective enough to be covered by the further statement in the letter that “protective articles such as laboratory aprons, rubber gloves, etc.” and the statement in the technical bulletin that “protective items” would be paid for. The plaintiff’s dean was imprudent, if not careless, in continuing, in the face of these warnings, to supply the laboratory coats to students without collecting their cost from the students, or without obtaining specific assurance from the VA that it would pay for them.
The dean no doubt acted in good faith. No profit to the school was involved in collecting the money from the VA rather than from the students, except possibly a small handling charge. Making the students pay for the coats would hardly have prevented any students from attending the school, since the charge was a small one. There is, therefore, considerable equity in the plaintiff’s claim, which equity is tempered somewhat by the dean’s imprudence.
As to $81.70, the charge for the coats delivered to students under written contracts providing for reimbursement for uniforms and those delivered before the VA gave notice of *780 its change of policy, the plaintiff is entitled, under section 1492 of Title 28 of the United States Code, to a judgment, and judgment will be entered to that effect. As to the balance of the claim, we report our findings and opinion to the Senate.
It is so ordered.
LaramoRe, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
EINDIWGS OE EACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, a non-profit educational institution, is a corporation organized under the laws of the Commonwealth of Massachusetts having its principal office at Boston, Massachusetts. During all times herein pertinent, it has been an institution approved by appropriate authority for the training of veterans under the provisions of Public Law 16, 78th Cong., enacted March 24, 1943, 57 Stat. 43, and Public Law 346, 78th Cong., enacted June 22, 1944, 58 Stat. 284.
2. On January 6, 1955, private bill S. 104 was introduced in the United States Senate, which reads in pertinent part as follows:
A BILL
For the relief of the Massachusetts College of Pharmacy.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the Massachusetts College of Pharmacy, Boston, Massachusetts, in full satisfaction of its claim against the United States, the sum of $17,259, such sum representing the cost of laboratory coats sold by such college to veteran students and charged to the United States under Veterans’ Administration Regulation 10539 (D) (4), but which sum, after a ruling by the Comptroller General that such *781 coats were not proper items to be charged to the United States, was repaid to the United States, the officials of the Massachusetts College of Pharmacy having been erroneously advised by an employee of the Veterans’ Administration that such coats were proper items for billing against the United States under the aforementioned regulation:
*****
3. This claim is before the Court of Claims pursuant to Senate Eesolution 196, reported by United States Senate Committee on the Judiciary [Report No. 1449], 84th Cong. 2d sess., considered and agreed to February 3 (legislative day, January 16), 1956, which reads as follows:
Resolved, That the bill (S. 104) entitled “A bill for the relief of the Massachusetts College of Pharmacy” now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of Sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving-such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
The plaintiff’s petition herein was filed on April 11, 1956.
4. On October 16,1944, the plaintiff, by its president, submitted a proposal for vocational rehabilitation training for instruction of disabled veterans under Public Law 16 to the defendant which was approved and accepted on behalf of the defendant on October 20, 1944, by the manager of the Boston, Massachusetts office of the Veterans Administration. Upon acceptance, this proposal became the contract between the plaintiff and the defendant for the education and training of disabled veterans from September 7, 1944 to June 30, 1945. It provided for the conducting by the plaintiff of regular courses in the undergraduate curriculum leading to the degree of bachelor of science in pharmacy and is quoted in part as follows:
*782 The matriculation or registration _ fee is $5.00. _ The books, supplies, uniforms, and equipment to be issued during each of the four years is as follows:
Uniforms
Chemistry laboratory coat, $2.50;
Laundry and rental of pharmacy laboratory coats, $8.00
Boots Supplies and equipment
Freshman_$45. 00 Laboratory fees_$55.00
Sophomore_45.00 Laboratory fees_ 45.00
Junior_ 45.00 . Laboratory fees- 45. 00
Senior_ 45.00 Laboratory fees_ 60.00
Diploma fee_ 10. 00
It is understood that books, supplies and equipment as issued become the property of the individual trainee as provided by Public Law 846,78th Congress.
t. * * * $
By renewal agreement, executed by the same parties referred to, the above described contract was renewed through June 30,1946.
5. Other contracts were entered into by the parties covering the period from September 16, 1946 through August 31, 1951. The other contracts referred to above make no reference to uniforms or charges for laboratory coats but do provide for payment by the defendant for books and supplies furnished the veteran either up to a specified maximum amount per year or at the same charges applicable to other students pursuing the same courses. Effective November 1946, however, the plaintiff was to receive a 10 percent handling charge for the issuance of books, tools, equipment and/or supplies to veteran trainees.
6. A List of Required Textbooks and Laboratory Uniforms was prepared and issued in quantities for each class. This listed the required books by name and price and also listed required uniforms in the following terms:
Required Uniforms, to be obtained at the Students’ Cooperative:
A white coat (men) or a white frock (women) for the pharmacy laboratory. No deposit is required but a laundry ticket good for one semester must be purchased.
Laundry ticket_4.00
An olive drab coat for the chemistry laboratory_2.50
Upon issue of the books, the olive drab coat and the laundry ticket for each semester (there being two semesters per *783 school year), the student signed the supply sheet as the list came to be designated. The signed supply sheets in turn constituted the receipt which the school retained showing that it had issued the items listed to the students, veteran and non-veteran. This form of supply sheet had been in use before the veterans training program began at the college. For the school years 1944-1945 and 1945-1946 the form had shown the words “required uniforms” as quoted above. For the school years after September 1946, however, the supply sheet was headed List of Textbooks and Supplies and in the place of the quotation concerning required uniforms, there appeared:
❖ ❖ * * *
Protective garment for the pharmacy laboratory.
No deposit is required, but a laundry ticket good for one semester must be purchased.
Laundry ticket_4.70
Protective garment for the chemistry laboratory_3.25
7. During the period 1944 to 1951, the plaintiff also trained non-disabled veterans under Public Law 346 without formal written contracts. Of the total number of veterans enrolled in the plaintiff college, ninety percent were Public Law 346 veterans and 10 percent were Public Law 16 veterans.
8. Plaintiff, during the period 1944-1951 and for a long time prior thereto, required all students to wear laboratory coats when they were engaged in laboratory instruction. The dean of the college testified that these laboratory coats were required to be worn as a protective garment because chemicals and reagents, chiefly sulfuric acid, nitric acid, and sodium hydroxide, used in the laboratory were irritating and dangerous to the skin.
Although the supply sheet for the school year 1944r-1945 refers to a white frock for women students, it has not been developed in the record that any amount spent for white frocks for women is included in the plaintiff’s claim.
9. There were three types of laboratory coats worn by students which were described by plaintiff’s witnesses as follows:
(a) The coat designated by plaintiff as an olive drab was worn in the pharmaceutical chemistry laboratory but was *784 not worn by the junior class using this laboratory who wore the short white coat described below. It was khaki colored, made of cotton and was a relatively long coat. This coat was purchased by the plaintiff from the New England Overall Company of Boston and was generally known as a shop coat. It was not made specifically for plaintiff nor was the fabric used in manufacturing this coat specially treated. The olive drab coat had to be replaced by the student at least every other year and in many instances more often because the chemicals used by students burned holes in them. Plaintiff introduced in evidence an olive drab coat which had been worn by a student for nine months which showed typical evidences of the wearing of such coats in the laboratory. This coat showed many holes caused by spatters of acid. There appeared to be at least 30 holes, most of which were in the front of the garment.
(b) The coat designated as a short white coat was worn by students in the pharmacy laboratory, which was the dispensing laboratory where students compounded prescriptions. These coats were worn by all undergraduates except seniors and were made of cotton duck, tailored similar to the coat of a regular business suit and were of the type worn by counter help in drug stores servicing the fountain. These coats were not purchased by plaintiff but were supplied by the Ideal Linen Service, Inc. who laundered and starched them each week and the charge made to the students was for the rental and laundry service. These coats gave less than one year of service. There is no evidence that the short white laboratory coat was made of material specially treated for use in laboratories. Plaintiff introduced in evidence a short white coat which had been worn by a student which disclosed evidence of holes and mending where holes had developed.
(c) A second short white coat, obtained from the same source and on the same basis as the other white laboratory coat, was utilized by senior students only, as a distinctive coat. This coat was approximately the same length as the white coat used by other classes and was made of cotton of lighter weight than the other white coat. The style of the coat was also different. It was similar to the type used *785 by pharmacists and had a high collar which buttoned around the neck and had short sleeves. This coat was worn by seniors in the chemistry as well as the pharmacy laboratories. There is no evidence that this garment was made of material specially treated for use in laboratories. The plaintiff introduced as an exhibit a white laboratory coat as described above.
10. Students wearing these laboratory coats first removed their ordinary suit coats and wore the laboratory coats over their shirts. In the summer time, students often removed their shirts and wore the laboratory coat over their undershirts.
11. It was customary for institutions to list supplies in a lump sum on the voucher which they submitted to the Veterans Administration and not to itemize the supplies. This custom was followed by petitioner. Each voucher contained a certification signed by the dean of the college “that evidence of delivery of books, supplies and equipment on account of each veteran is available for inspection by the U. S. Government; that records on hand substantiate charges herein by signed receipts of each veteran-trainee; * * The supply sheets, signed by each student veteran, were used as the evidence of delivery of the supplies and these supply sheets were available at all times for inspection at the college by representatives of the Veterans Administration.
12. No charges for laboratory coats were made to the Veterans Administration after March 1951. At that time a representative of the Veterans Administration visited the college for the purpose of inspecting its books and records, to ascertain whether the tuition and other charges made to the Veterans Administration for the training of veterans under Public Law 346 were in conformity with the administrative standards prescribed in the Veterans Administration regulations.
In the course of this visit, the Veterans Administration representative informed the dean of the college that the payments made by the Government for laboratory coats supplied to veteran trainees were contrary to regulations and that the cost of laboratory coats was not an allowable charge. *786 The dean of the college immediately took the necessary steps to discontinue billing the Government for the laboratory coats.
13. Thereafter, the plaintiff sought administrative relief from the Veterans Administration but if was denied. The Veterans Administration central office in Washington held that the payments that had been made for laboratory coats were improper and that such payments should be recovered from the plaintiff.
14. At the suggestion of the Veterans Administration, the plaintiff conducted an audit of the amount which it had paid and for which it had been reimbursed (including a 10 percent handling charge for the greater part of the period) by the defendant, the correctness of which audit does not appear to be questioned. It shows sales and rentals of laboratory coats to veteran students for the years shown in the following amounts:
Sales of Rental of Total of Sales Annual Session Long Type Coat Short White Coat and Rentals
1944-1945_ $13.75 $22.00 $35.75
1945-1946_ 118.24 341.28 459.52
1946-1947_ 804.38 2,197.25 3,001. 63
1947-1948_ 606. 38 3,221.24 3, 827. 62
1948-1949_ 968. 00 3, 696.00 4, 664.00
1949-1950_ 501. 60 3,412.20 3,913.80
1950-1951_ 308.00 1, 048. 68 1, 356. 68
$3, 320.35 $13,938. 65 $17,259. 00
Thereafter conferences were had between the plaintiff’s officers and Veterans Administration representatives and, at the suggestion of the latter, the plaintiff submitted a reclaim voucher for the payments for laboratory coats for one student being representative of the balance of the claim. This was submitted to the Veterans Administration and by that office forwarded to the General Accounting Office. The Comptroller General, on July 22, 1952, denied plaintiff’s claim and on October 21, 1952, the plaintiff, at the request of the Veterans Administration representatives, repaid the sum of $17,259 to the defendant.
15.It is noted that the bill, which has been referred to this court, refers only to the cost of laboratory coats sold by the plaintiff. However, the amount set forth in the bill is the amount repaid by plaintiff for coats sold and rented *787 to veteran trainees. Defendant lias stated that it would raise no objection or question with, respect to the scope of this proceeding and it is clear that the bill was intended to encompass the cost of the coats which were rented as well as sold to veteran students.
16. Public Law 346 did not require that contracts be entered into between the Veterans Administration and the plaintiff for the training of veterans, although Public Law 16 did require contracts for the training of disabled veterans. Educational institutions would bill the Veterans Administration on the basis of its customary charges for tuition and books and supplies, which represented the charges to non-veteran students enrolled in the same course, and the finance division of the Veterans Administration would make payment thereon. Public Law 346 (58 Stat. 284), TITLE II, Part VIII, provides in pertinent part as follows:
*****
“5. The Administrator shall pay to the educational or training institution, for each person enrolled in full time or part time course of education or training, the customary cost of tuition, and such laboratory, library, health, infirmary, and other similar fees as are customarily charged, and may pay for books, supplies, equipment, and other necessary expenses, exclusive of board, lodging, other living expenses, and travel, as are generally required for the successful pursuit and completion of the course by other students in the institution:
*****
17. Pursuant to the provisions of Public Law 346, the Administrator of Veterans’ Affairs has, by regulations, prescribed certain policies and administrative standards for the payment of books and supplies.
18. Under Veterans Administration regulations, educational institutions were authorized to furnish veteran students with books and supplies consisting only of those required of other students pursuing the same course, such items to be no better in quality nor greater in amount than were required of the other students. (38 C. F. R. 36.249, 1945 supp., promulgated April 17, 1945, 10 F. R. 4502.) De *788 fendant has not questioned the fact that plaintiff bas met the requirements of this regulation.
19. Upon delivery of supplies to veteran students, Veterans Administration regulations required that the veteran sign a receipt but did not require that the receipt be in any particular form. Under the regulations in existence at the times pertinent to this case, educational institutions like the plaintiff did not have to itemize charges for supplies but could voucher for a lump sum by indicating that said amount represented supplies furnished. However, the voucher was required to contain a certified statement to the effect that the institution had on hand and available for inspection by the Veterans Administration evidence of the delivery of supplies. (38 C. F. R. 36.247 (c), 1945 supp., promulgated April 17, 1945, 10 F. R. 4502.) The purpose of the certified statement was to enable prompt payment, subject to a subsequent audit or a review of charges to be made by the Veterans Administration. (38 C. F. R. 36.247 (b) (1), 1945 supp., promulgated April 17, 1945, 10 F. R. 4502.) The vouchers submitted by plaintiff billed for supplies in a lump sum, without specifying that such supplies included laboratory coats and contained the required certification. Plaintiff also had the required receipts available for inspection by the Veterans Administration. These have been previously referred to as “supply sheets.”
20. Under Public Law 346, the Government bore the costs of education of veterans enrolled in educational institutions and also paid such students a stipend, described in the statute as a “subsistence allowance”, so long as the veteran attended school at Government expense. Public Law 346 (58 Stat. 284), TITLE II, Part VIII, provides in pertinent part as follows:
“6. While enrolled in and pursuing a course under this part, such person, upon application to the Administrator, shall be paid a subsistence allowance of $50 per month, if without a dependent or dependents, or $75 per month, if he has a dependent or dependents, including regular holidays and leave not exceeding thirty days in a calendar year. Such person attending a course on a part-time basis, and such person receiving *789 compensation for productive labor performed as part of their apprentice or other training on the job at institutions, business or other establishments, shall be entitled to receive such lesser sums, if any, as subsistence or dependency allowances, as may be determined by the Administrator: Provided, That any such person eligible under this part, and within the limitations thereof, may pursue such full time or part-time course or courses as he may elect, without subsistence allowance.
Jit * % #
Later amendments increased the amounts referred to above. Similar subsistence allowances were provided also for Public Law 16 veterans.
21. In connection with the payment for supplies, provided by Public Law 346 as set out in finding 16 above, the Veterans Administration set certain administrative standards defining items for which payment would not be made. On October 3, 1945, by letter addressed to all regional offices, the Veterans Administration provided operating instructions with respect to supplies furnished veterans at Government expense. The letter reads in pertinent part, as follows:
* * * * *
Under the terms of Public Laws 16 and 346, 78th Congress, the furnishing of equipment and supplies to beneficiaries is authorized subject to such administrative rules and regulations as the Administrator may establish. _ A general policy has already been stated that nothing will be furnished at government expense which is not required by the training institution or establishment to be the personal property of all other students taking the same course. The promiscuous furnishing of certain articles is so fraught with the probability of abuse as to make it necessary to limit the practice.
One of the purposes of a maintenance allowance is to enable the beneficiary to provide himself with clothing. Therefore,_ items which are worn in lieu of ordinary clothing will not be classed as articles of training equipment or training supplies. Consequently, gymnasium clothing, laboratory coats and trousers, nurses’ or technicians’ uniforms, school or military uniforms, coveralls and_other similar articles will not be provided, notwithstanding the fact that it may be a requirement of the training establishment that clothing of a certain *790 type or style shall be worn by all students or employees. Protective articles such as laboratory aprons, rubber gloves, etc., which are worn primarily for the purpose of protecting the wearer from physical harm as distinguished from protecting his undergarments, may be furnished when they are required for all students taking the same course.
c * # * #
The employees of the Boston Regional Office were advised of the contents of the above letter but it was not distributed to educational institutions.
22. After the issuance of the quoted letter, its contents were called to the attention of the dean of the college by a Veterans Administration representative. The letter was not shown to the dean.
The Veterans Administration representative raised the point that the college had uniforms listed on their supply sheet, and that uniforms were no longer eligible as supplies for veterans. He stated that there had been some abuses in that some institutions had charged the Veterans Administration for athletic uniforms, contrary to what was intended, and that uniforms used in place of regular clothing were not chargeable to the Government. The representative of the Veterans Administration stated that protective garments were still included as supplies.
The dean stated to that representative that he would not dare to have students in the laboratory without some kind of protective garment. As a result of this conversation, the dean, believing that the laboratory coats were protective garments, caused the supply sheets to be changed from the designation “required uniforms” to “protective garment” in reference to the laboratory coats. This change was made in September 1946 as described in finding 6. Although the dean testified at the trial that a representative of the Veterans Administration advised him to make this change, he was unable to identify such representative. The contracting officer did not so advise the dean.
23. On February 28,1947, the Veterans Administration issued a technical bulletin designated as TB 7-25 which further clarified its operating procedures with respect to books, supplies and equipment furnished veterans under Public *791 Law 346, with a view to assisting the institution in connection therewith. Paragraph 3.d. of TB 7-25 reads as follows:
Items in lieu of ordinary clothes will not be classed as training equipment or supplies. Therefore, athletic or physical education clothing, laboratory coats and trousers, nurses or technician uniforms, school or military uniforms, coveralls or similar articles will not be interpreted as within the definition of supplies and will not be provided by VA. Protective items worn primarily to protect the wearer from physical harm as distinguished from protecting his undergarments may be furnished when required of all students. (Letter from Asst. Adm. for VE&E to all EC’s, Oct. 3, 1945)
A copy of TB 7-25 was mailed by the Veterans Administration to the plaintiff.
24. The foregoing regulation was continued and carried over, in substantially the same terms, into Veterans Administration Manual M7-5, dated April 15, 1947. Section VII of the said manual makes the regulation applicable to both Public Laws 16 and 346 students and is titled “BOOKS, SUPPLIES, AND EQUIPMENT, INCLUDING TOOLS, FOE PAST VII OE PAST VIII TRAINEES.” Paragraph 82 d. under this section is titled “Supplies” for which payment may be made and items for which payment may not be made” and subparagraph (4) thereunder provides as follows:
Items worn in lieu of ordinary clothes will not be classed as “supplies.” Therefore, athletic or physical education clothing, laboratory coats and trousers, nurses’ or technicians’ uniforms, school or military uniforms, coveralls, or similar articles will not be interpreted as within the definition of “supplies” and are not paid for by VA. Protective items worn primarily to protect the wearer from physical harm as distinguished from protecting his undergarments may be furnished and paid for by the VA when required of all students.
A copy of the Veterans Administration Manual M7-5 was mailed to plaintiff after its publication. In addition, all subsequent changes to the regulations were also mailed to plaintiff as they were issued.
*792 25. The regulation, par. 82 d. (4) noted in finding 24 was continued in force, until it was republished on July 1, 1948, in exactly the same language as Veterans Administration regulation 10539 (D) (4). Plaintiff’s dean admitted he became familiar with this regulation when it was published. The dean of the college testified that he received, from the Veterans Administration, copies of all of the Veterans Administration regulations pertaining to the education of veterans as well as any modifications affecting them.
The first written communication the plaintiff received from the Veterans Administration relating to the charge-ability of laboratory coats as supply items was TB 7-25, dated February 28,1947.
26. Under a Veterans Administration regulation promulgated on October 10, 1947, governing the internal management of regional offices, a review of charges was required to be made of all schools which were being paid without a formal contract. The purpose of such a review was to determine whether the charges submitted and paid by the Veterans Administration were in accordance with the statutes and regulations. The evidence indicates that training officers of the Veterans Administration visited plaintiff monthly but that their visits were concerned with problems of the veteran students in an effort to assist such students in their training. None of these Veterans Administration representatives inspected the books and records of the colleges for the purpose of checking upon the propriety of the charges made by plaintiff.
Although the above-described regulation came into effect in 1947, the Veterans Administration witness charged with the responsibility of making the review of charges stated that no review of charges of any school had been undertaken until 1950 because in the Boston area there were 1400 schools under his supervision with only 8 or 9 men to perform the task. He therefore concerned himself first with the problem of starting the flow of tuition and other payments to schools so they could operate and then undertook later by review to determine whether there were any irregularities in the charges made by schools. Action by the Boston Regional Office with respect to any school did not *793 get under way until 1950 and it was not until March 1951 that a contract officer in making his review of charges of the plaintiff found for the first time that the plaintiff had been making charges for laboratory coats.
27. It is clear from the entire record that the plaintiff issued laboratory coats to veteran students in the expectation of reimbursement to it by the defendant. It received payment for coats issued to non-veteran students at all times.
28. Students engaged in both the chemistry and pharmacy laboratories were required to and did use concentrated acids and other chemicals harmful to the skin.
29. Although the plaintiff has introduced evidence of tests made by its supervisor of chemistry and chairman of its chemistry department to demonstrate the effectiveness of the laboratory coats in protecting the students from harm from the spillage of chemicals, no detailed finding is made as to the result of such tests because it is a matter of common knowledge that strong acids if spilled on ordinary wearing apparel will damage it, and if permitted to contact the human body will damage tissue.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States eighty one dollars and seventy cents ($81.70).