*809 Opinion,

per curiam:

This case was referred by tbe court, pursuant to Rules 45 and 46, to Marion T. Bennett, a commissioner of tbe court, with directions to make findings of fact and recommendations for conclusions of law. Tbe commissioner has done so in a report filed December 12,1957. When more than 15 days elapsed after tbe filing of this report and neither party gave notice in writing of an intention to except to tbe commissioner’s findings or recommendations, tbe defendant filed a motion for judgment in accordance with the recommendations of tbe commissioner. Since the court agrees with tbe recommendations and findings of tbe commissioner, as hereinafter set forth, it hereby adopts tbe same as tbe basis of its judgment in this case. Plaintiff is not entitled to recover and its petition will be dismissed.
It is so ordered.
OPINION OF THE COMMISSIONER
The petition presents a claim for recovery of additional compensation by way of an increase or redetermination of tbe rate of tuition received from tbe Veterans Administration for instruction and training of veterans and arises under tbe Servicemen’s Readjustment Act of 1944, Public Law 346, 78th Congress (58 Stat. 284). Tbe parties rely upon tbe administrative record which was received into evidence at a pretrial conference.
At tbe outset, defendant challenges the jurisdiction of tbe court over tbe subject matter of tbe claim. This is a matter which could have been presented to tbe court by a motion to dismiss. Such a motion was presented by defendant in Hemphill Schools, Inc., v. United States, 133 C. Cls. 462. Defendant relies again on tbe cases it cited in Hemp-hill. Tbe court in that case overruled the motion to dismiss, stating that tbe factual and legal issues disclosed by tbe pleadings, briefs and arguments needed to be developed by trial. However, tbe court further stated:
* * * We do decide that we have jurisdiction under 28 U. S. C. 1491 and that tbe Administrative Procedure Act does not oust this jurisdiction.
Tbe cases relied upon by defendant have been examined. But, it is determined that, in light of the court’s decision in *810 Hemphill and for tbe reasons stated there, the claim is within its jurisdiction.
Attention is now directed to the issue of whether the administrative action in the pending case was supported by substantial evidence, as asserted by defendant, or whether it was illegal because it was erroneous, arbitrary and capricious, as alleged by plaintiff.
Plaintiff commenced operations on May 31, 1949, under a contract covering the period May 31, 1949 to November 30, 1949. As the school had no prior cost experience or established tuition rate, the Veterans Administration estimated its cost of operation and set a rate of 70 cents per hour for the first contract. This rate is not in dispute here.
Under the Servicemen’s Keadjustment Act of 1944, cited above, the Administrator of Veterans’ Affairs was required to pay schools training veterans the charges made by the school to nonveteran students and designated as the “customary cost of tuition.” Schools could and did fix tuition rates up to the maximum of $500 per school year provided by the law without regard to the cost or value of services rendered. To control this situation the Veterans Administration promulgated a regulation known as change 4,38 CFE (1949 ed.) 21.530, effective July 1, 1948, providing, among other things, that schools, established after the enactment of Public Law 346 and with an enrollment consisting of a majority of veterans, were to be considered as not having a customary cost of tuition. They were required to submit financial statements showing their most recent operating costs which would then be used in fixing “fair and reasonable” tuition rates. A portion of this regulation was incorporated into Public Law 266, 81st Congress, approved on August 24, 1949 (63 Stat. 631), and Public Law 610, 81st Congress, July 13, 1950 (64 Stat. 336).
Plaintiff, coming within the foregoing provisions, was required to and did submit cost data for its first 5 months of operation, May 31, 1949 to October 31, 1949. The Administrator determined a fair and reasonable rate of tuition for the course in upholstery as 65 cents per hour for veteran students, commencing December 1, 1949. This was incorporated into contract V3006V-662 covering the period *811 December 1, 1949 to September 30, 1950, but plaintiff reserved the right to appeal the determination to the Veterans Tuition Appeals Board.[1]
The board did not consider the Veterans Administration’s analysis proper nor the school’s first 5 months of operation as representative, especially since a statement of operating expenses for a later period, July 1, 1949 to June 30, 1950, had been offered in evidence and was available. An order was issued remanding the case to the Veterans Administration for a redetermination of the tuition rate based upon the “most representative cost data available.”
The Veterans Administration made an analysis of the cost data, audited plaintiff’s books and records, considered whether payments claimed were reasonable in amount and were for necessary items and services and arrived at a tuition rate of 61.7 cents per hour. Plaintiff was still dissatisfied and again appealed to the board claiming a rate of 95 cents per hour. The final decision of the board was rendered on October 12,1955, and held that a fair and reasonable rate of tuition should be 68.8 cents per hour of instruction and training to veterans and ordered the contract modified accordingly. Thus, the plaintiff was paid the difference in the tuition rate of 3.8 cents per hour in accordance with the decision of the board for all veteran training from December 1, 1949, until the school was closed on October 28, 1952, a total of 668,066 hours. The plaintiff had been paid currently the rate of 65 cents per hour for instruction and training determined earlier by the Administrator.
The plaintiff contends that the allowances determined by the board as fair and reasonable costs for the items of teaching, consumable supplies, administrative expense and advertising were erroneous and arbitrary. Plaintiff now claims that 91.6 cents would be a proper allowance, based upon its total costs plus a profit of 10 percent. Accordingly, plaintiff claims 22.8 cents per hour, the difference between 68.8 cents allowed by the board and the claim of 91.6 cents, for *812 668,066 hours of instruction, and training for veterans from December 1, 1949 to October 28, 1952. This amounts to a total claim of $152,319.05.
Both the Administrator and the appeals board found that plaintiff school had operated at approximately 75 percent of authorized maximum capacity during the year that ended June 30, 1950. There was no finding of normal operating capacity, considering normal dropouts and replacements.
The plaintiff’s average monthly enrollment for the cost period ended June 30, 1950, was 15,730 instruction hours, or 75 percent of the authorized maximum capacity for that year. The average monthly enrollment for the claim period from December 1,1949 to October 28,1952, was 19,088 hours of instruction for veterans. Thus, the average enrollment during the year for which costs are considered was approximately 82.5 percent of the enrollment for veterans during the claim period after December 1,1949. In addition to the enrollment of veterans, the plaintiff enrolled nonveteran students, commencing late in 1950 or early 1951, and attained a maximum enrollment of nonveterans of 20 to 30 students, representing approximately 20 percent of the authorized maximum capacity. Also, commencing in April 1951, about 70 nonveterans were enrolled in a correspondence course provided by plaintiff. Considering both veteran and nonveteran enrollment during the period December 1, 1949 to October 28, 1952, the actual enrolhnent during the cost period ended June 30, 1950, was something less than 75 percent of actual operating capacity of the school.
The reasons for the limited enrollment during the cost period are two in number. First, the State education department authorized a maximum enrollment of 80 students for instruction at the premises and facilities provided. Later, authorized maximum enrollment was increased to 100 students, effective May 15, 1951, employing the same premises and facilities. Plaintiff’s maximum enrollment was not attained until about August 1949. Then Public Law 266, 81st Congress, approved August 24, 1949 (63 Stat. 631, 653), known as the Independent Offices Appropriation Act, 1950, precluded any payment for veterans who enrolled in any institution that had been in operation less than 1 year, *813 unless such, enrollment was prior to the date of the act. The plaintiff school had not completed a full year of operation until May 1950 and by this time its enrollment had dropped to about 32 percent of the authorized enrollment, due to its inability to replace students who dropped out and to the substantial number of day students who were graduated during March, April, and May 1950.
The cost of instruction and training for the claim period would not increase proportionately to the substantial increase in enrollments and the hourly cost of instruction would be correspondingly reduced.
The plaintiff school was incorporated by George Edelman, his father Max Edelman, and Irwin H. Wexner. They owned all of the capital stock. Each was paid a salary of $8,333.32, amounting to a total of approximately $25,000 per annum, which was claimed as operating expense. In addition, the plaintiff employed a full-time director of the school, who was paid $8,265 for the year, and teachers for all regularly assigned classes and clerical assistants.
Max Edelman offered advice in connection with the purchase of supplies and in shop training, but there is no satisfactory evidence that he was engaged at the school any substantial amount of time or that his services were necessary for the operation of the school. Irwin Wexner was regularly employed as assistant principal at the Astoria (L. I.) Junior High School, but was engaged at the plaintiff school from 3:30 p. m. until closing as registrar. He was in charge of enrollments and policy matters relating to students, advertising, the keeping of records, and office management. During the day his work was regularly performed by the secretary whose salary was less than one-third as much as his. George Edelman devoted his full time to the activities of the school. He was regularly engaged in hiring employees, purchasing supplies, performing the bookkeeping, and preparing cost data, and did part-time teaching. The board decided, and properly so, that the plaintiff’s costs were overburdened with higher paid officials who engaged in administrative details normally performed by the lesser paid clerical staff.
*814 The plaintiff claims $55,628.24 for teaching and related personnel, which includes all of the director’s salary and three-fourths of the salary of George Edelman. The plaintiff contends that Director Bernstein was engaged in teaching three-fourths of the time and one-fourth in the supervision of teachers and the school curriculum; that three-fourths of George Edelman’s time was devoted to teaching and one-fourth to administrative duties. Neither of them had any regularly assigned classes, but substituted for regular teachers and conducted classes or groups for make-up work. The plaintiff’s contract provided for reasonable absences of 5 percent of the course of instruction, without deduction of payment. The required make-up time was less than 1 percent of the total student hours of instruction for which payment was made.
The board allowed $41,113.25, which included the salaries of all regularly assigned instructors, a supply attendant and a clerical assistant. Considering the limited enrollment during the first year of operation, the amount so allowed is fair and reasonable for 188,765 hours of instruction paid for by the Veterans Administration.
The plaintiff claimed $39,338.88 for the cost of all consumable supplies purchased during the year ended June 30, 1950, without regard to inventories of supplies on hand at the beginning and end of this period. Purchases in June 1950 were $12,410.63. The plaintiff’s records did contain an entry for an inventory taken April 30, 1950, with a value of $10,864.15. There are no other inventory figures, however, from which an accurate determination can be made of the cost of supplies consumed during the cost data period. By applying purchases from the beginning of operations to April 30, 1950, less inventory on hand at that time, to the instruction hours for the same period, the rate of 13.43 cents per hour is established. The cost of consumable supplies for the year ended June 30, 1950, for 188,765 instruction hours at 13.43 cents per hour is $25,351.14. The board so determined. It is fair and reasonable.
The plaintiff’s presumption of error in the April 30,1950, inventory valuations prepared by George Edelman is not *815 supported by any substantial evidence. No list was furnished showing prices applied and the inventory itself was not produced as evidence to support plaintiff’s inferences of error therein.
The plaintiff claimed $22,821.47 for administrative salaries, which includes the full salary to Max Edelman and Irwin Wexner, and one-fourth of the salary to George Edelman, $2,380 for a secretary and $1,191.50 for part-time clerks. The board allowed $10,000 for the executive functions and $5,000 for necessary services on the clerical level. Considering the duties performed by the proprietary officials and the limited enrollment of students during the first year of operation, the allowance of $15,000 for administrative expense for the year ended June 30,1950, was fair and reasonable.
The board excluded from traveling expense the sum of $182.10 for entertainment, since it was not a necessary expense of operating the school. This was neither erroneous nor arbitrary.
The board allowed the sum of $1,200 for legal and accounting expenses. Plaintiff had claimed $2,332. The Administrator had allowed $1,000. The plaintiff’s actual cost for legal and accounting services for the year ended June 30, 1950, was $482. During the year, the plaintiff also paid $1,050 for legal services in organizing the corporation and in negotiating with the State authorities for the approval of the school prior to May 15, 1949. It also paid $800 for services in negotiating the price of the first contract with the Veterans Administration because plaintiff had no operating cost experience. Estimated costs were calculated and considered. These costs represent prepaid items and should be properly allocated over the period of anticipated operations. The plaintiff also paid $1,200 in June 1951 for services in negotiations with the State to obtain an increase in its authorized enrollment from 80 to 100 students, which was approved effective May 15,1951. This item is similarly classified as organizational expense in obtaining authority for the full utilization of its facilities in later operations. Considering the limited enrollment during the first year of plaintiff’s operation, the board’s allowance of $1,200 for *816 legal and accounting services is amply rewarding, fair, and reasonable.
The board disallowed interest expense of $696.64 on borrowed money and discounts of $147.46 for the prompt payment of its vouchers by the Veterans Administration. The plaintiff corporation had paid in capital of $20,000, but only $10,000 was available for operational purposes as the State education department required the deposit of a $10,000 cash bond which was not released until sometime in 1950. The interest and discount expense resulted primarily from the inadequacy of operating capital and the payment of salaries to proprietary officials in excess of that which would be commensurable with services rendered. These costs are properly excluded.
The total administrative expense allowed by the board in the sum of $17,684.41 is fair and reasonable for the determination of a tuition rate commencing December 1,1949.
Plaintiff claims $387.85 representing a payroll theft, charitable contributions and the cost of a Christmas party for students. The claim was disallowed by the Veterans Administration and by the board. There is no evidence that the expenditures represented necessary or normal costs of operating the school. The disallowance was proper. The board allowed $102.75 for magazine subscriptions, association dues, and medical expenses arising from injuries on the school premises.
The plaintiff claims error on the part of the board in excluding $335.23 from its advertising costs for the year ended June 30, 1950. The board allowed $8,935.80. The items excluded consisted of $144 donated to a paralyzed veterans’ association and certain other amounts which the Administrator found were improperly classified. The plaintiff failed to prove that these items should be properly classified as advertising expense. Furthermore, advertising is primarily a prepaid expense and the anticipated benefit is realized after the expense is incurred. The plaintiff was restricted in obtaining enrollment of veterans from August 1949 until it had completed its first year of operation which ended May 30, 1950, under Public Law 266. Thus, adver *817 tising for the enrollment of veterans during this period would appear questionable. Under the circumstances, the allowance by the board for advertising expense appears fair and reasonable and is so found.
There is no evidence that the decision of the Veterans Education Appeals Board was erroneous, or that the members thereof were arbitrary or capricious in their determination and thus acted illegally or that they were without authority to make adjustments to plaintiff’s statements of operating costs in order to determine a fair and reasonable tuition rate. Plaintiff has not sustained its burden of proof. Feener Technical Schools, Inc., v. United States, 136 C. Cls. 94. Metropolitan Training Center v. Gray, 188 F. 2d 28. The administrative decision is detailed, carefully considered and is supported by substantial evidence.
EINDINGS OE EACT
1. The plaintiff is, and at all times material herein was, a corporation for profit, duly organized and existing under the laws of the State of New York, having its present office and principal place of business at 64 Polo Road, Great Neck, New York.
2. On May 16,1949, the plaintiff school was approved and licensed by the education department of the State of New York to furnish education and training in upholstering in the premises and facilities on the eighth floor of 39-47 West 19th Street, New York City, for a course of not less than 1,000 hours, with an enrollment of not to exceed 80 students at any one time.
Plaintiff operated the school for upholstering from May 31, 1949 to October 28, 1952, at which time it ceased operations. It provided instructions for eligible veterans in a 1,000-hour course in upholstering during the aforesaid period under Public Law 346, 78th Congress, approved June 22,1944 (58 Stat. 284, 287).
3. Plaintiff entered into contracts with the Veterans Administration with respect to the training of veterans under this law as follows:
*818 Contract No.
Period covered
From
To
Tuition rate per hour of instruction
V3006V-497— May 31,1949 Nov. 30,1949 00.70
V3006V-662 _ Pec. 1.1949 Sept. 30,1950 .65
V3006V-869_. Oct. 1,1950 Sept. 30,1951 .65
V3006V-1577. Oct. 1,1952 Sept. 30,1953 .65
The rate of 70 cents per hour contained in the first contract was based upon estimated costs of operation and is not involved in this suit.
Contract V3006V-662 contains the following provisions:
ARTICLE 2. PAYMENT
* * * * #
(d) The Contractor agrees that the payment for services and articles as set forth in paragraphs (c) and (d), Article 1, shall not exceed the charges generally made to other (regular) students pursuing the same or similar courses of instruction except where the Veterans Administration has agreed to pay adjusted tuition as fair and reasonable compensation for services rendered. _ It is further agreed that the Veterans Administration will not pay in excess of customary charges for Part VII trainees unless it has been determined by the Veterans Administration that the institution, in order to provide additional facilities to afford education or training to Part VII trainees, needs additional compensation to cover the cost of such additional facilities.
(e) The Contractor agrees that in no event will the Veterans Administration pay on account of a Public Law 346 veteran more than $500 for an individual course of less than one year. The Contractor also agrees that the Veterans Administration will not pay customary charges for any course on account of any veteran enrolled under Public Law 346 more than the rate of $500 for a full-time course for an ordinary school year unless the veteran elects to have, charges paid in excess of such limitation and to have his period of eligibility charged proportionately.
4. This action is brought to recover the sum of $152,319.05 [2] for providing 668,066 student hours of instruction during *819 the period December 1, 1949 to October 28, 1952, represented by the difference between the rate of 68.8 cents per student hour which was determined by the Veterans Education Appeals Board and received by the plaintiff, and the rate of 91.6 cents per student hour which the plaintiff alleges should have been paid.
5. Public Law 266, 81st Congress, approved August 24, 1949, as the Independent Offices Appropriation Act, 1950 (63 Stat. 631, 652), amended by Public Law 610, 81st Congress, approved July 13, 1950 (64 Stat. 336), provided that where contracts were in effect for two or more successive years the rates of tuition in the most recent contract would be considered the “customary cost of tuition,” and that in cases where no customary cost of tuition was established the Veterans Administration should fix a “fair and reasonable rate” for tuition and other fees.
Plaintiff had not established a customary cost of tuition for its 1,000-hour course in upholstery prior to December 1,1949.
6. Veterans Administration Manual 7-5 contained regulations for the determination of fair and reasonable tuition rates. These regulations, as amended by change 4, effective July 1,1948, provided in part:
§ 21.530. Determination of fair and reasonable compensation. The determination of fair and reasonable compensation by the manager, as in the case of courses of less than 30 weeks, or courses of 30 weeks or more in institutions other than nonprofit will require the submission by the educational or training institution of detailed, certified financial statements showing the most recent actual cost experience of the institution for the specific courses involved including. cost data on the items of expense which will be used for the determination of fair and reasonable compensation, the basis on which teaching salaries and other expenses have been allocated to the courses involved, and the number of students enrolled and the number of clock hours or credit hours during the period covered by the cost data. In the case of new courses for which no actual cost experience is available, estimated costs may be submitted.
*****
(b) For institutions other than nonprofit for either courses of less than 30 weeks or courses of 30 weeks or more. Fair and reasonable compensation for schools *820 operated for profit will not exceed the actual or estimated costs to the institution for providing the instruction, plus an allowance for profit as indicated below. In determining the fair and reasonable compensation all expenses, except expenses for sales commissions and promotional plans, which are reasonable and necessary for the operation of the courses involved will be included in the cost statement and such expenses will be grouped into the general categories set forth below within the limits designated.
(1) Actual cost of teaching and related personnel at reasonable salaries. Teaching and related personnel will include personnel essential to the teaching function such as laboratory supply room attendants and clerical personnel assisting teachers in the preparation of instructional material and records. The salaries of personnel serving both in administrative and teaching functions will be prorated accordingly. The cost shown for teaching personnel will be supported by a schedule listing the name, title, annual salary rate, and will show whether employment is part-time or full-time for each person included in such cost.
(2) Consumable instructional supplies.
(3) Depreciation on building and equipment actually used for instruction of students at rates allowed by the Bureau of Internal Revenue for income tax purposes.
141 Reasonable rent.
(5) Cost of heat, light, power, water, janitor service, and building maintenance.
161 Taxes and insurance, exclusive of income taxes.
(7) Actual administrative expenses which are considered reasonable and necessary in the operation of the school and are properly allocable to the courses under review. Such expenses may include salaries of administrative and clerical personnel representing reasonable compensation for services actually performed and the cost of such items as postage, telephone and telegraph, travel, interest, legal and accounting fees for actual service (not retainers), stationery and office supplies, and such other similar expenses as are reasonable and necessary for the operation of the school, provided that in no case will there be included in the fair and reasonable cost determination a base salary in excess of the rate of $10,000 per annum for an individual who has a proprietary or bonus interest in the institution. The administrative cost must be itemized and the salary items must be supported by a statement showing for *821 each, person the name, title, annual salary, percentage of time deyoted to administration, and the amount of salary allocated to the cost of the courses under review. All cases where requested administrative costs exceed 15 percent of subparagraphs (1), (2), (5), and (6) of this paragraph shall be forwarded to the Assistant Administrator for Vocational Rehabilitation and Education, central office, for review and approval.
(8) Advertising expense calculated in accordance with the procedure set forth below and not to exceed the limitations prescribed herein.
(i) Determination of amomt allowable for advertising expense. * * * In no event will a newly established school, without actual cost experience for advertising expense, be permitted to include advertising expense in excess of 8 percent of gross income from tuition for resident instruction.
$ $ ‡ $
(9) Profit not to exceed 10 percent of the amount customarily charged to nonveteran students for the course. * * * If no nonveteran students are enrolled and there is therefore no real customary charge actually being paid by nonveteran students, the profit allowance will be determined as one-ninth (%th) of the total allowable costs included in subparagraphs (1) to (8) of this paragraph.
(10) Expenses for sales commissions and promotional plans will not be allowed.
(c) When the manager has completed his analysis of the cost data. When the manager has completed his analysis of the cost data, he will determine on the basis of the total number of all students trained and cost of the items listed herein after reflecting known changes in costs whether the customary charges of the educational or training institution are fair and reasonable. In making this determination, the manager will give consideration to the fact that it is not fair and reasonable for the Veterans’ Administration to pay a charge based on the full cost of operating an educational institution under abnormal situations, such as periods when enrollments in the institution are far below the normal capacity and expectancy of the institution, or where operating costs are greatly in excess of normal operating costs for other comparable institutions in the same general locality. Contracts, when required, will be negotiated to provide payment not to exceed the amounts determined by the manager to be fair and reasonable as provided herein.
*822 7. On October 7,1949, the New York regional office of the Veterans Administration, sometimes referred to herein as the VA, requested plaintiff to submit statements of its actual costs of operation and furnished instructions and specimen statements of the costs required for consideration in the determination of a fair and reasonable tuition rate for the renewal contract after November 30,1949.
On or about November 10, 1949, the plaintiff submitted cost data of its operations from May 31 to October 31, 1949. The plaintiff computed a tuition rate of approximately 84 cents a student hour for the period beginning December 1, 1949, based upon its cost data submitted, and proposed a rate of 95 cents for the new contract.
8. The VA contracting officer, who was charged with negotiating with plaintiff’s representatives, made no verification of the cost data submitted by plaintiff. He did check the enrollment of veterans for the period May 31 to October 31, 1949, but based his determination for a fair and reasonable tuition rate largely upon allowances to other similar institutions in the area. His determination was 65 cents an hour for veteran students.
On January 12, 1950, the plaintiff accepted the rate of 65 cents an hour for contract payments, but reserved the right to appeal. Contract V3006V-662, dated December 1,1949, but executed about January 20,1950, contains a clause expressly reserving the right to appeal to the Veterans Tuition Appeals Board. It reads as follows:
The execution of this contract shall be without prejudice to the Field School of Upholstery and Allied Trades, Inc., to appeal to the Veterans’ Tuition Appeals Board the question of existence of customary cost or of fair and reasonable rates; and the contract shall be subject to any revision made by said board pursuant to the governing statutes and regulations.
9. The plaintiff filed its formal notice of appeal on September 11,1950, and its application for appeal on November 30,1950, with the Veterans Education Appeals Board, which succeeded the Veterans Tuition Appeals Board. The Veterans Education Appeals Board, sometimes referred to hereinafter as the board, referred the matter to a hearing exami *823 ner who heard testimony and received other evidence May 5 to 8,1953.
The certified cost data submitted by plaintiff for the period of operation from May 31 to October 31, 1949, was filed at the hearing May 6, 1953. There was also filed cost data for the year July 1, 1949 to June 30,1950, which were certified under date of July 28,1950, by the plaintiff’s president.
The proposed findings and pleadings of the parties were based upon the cost data for the first 5 months of operation which ended October 31,1949, and the initial decision of the hearing examiner, dated March 10,1954, was also based upon such cost period. In this decision the hearing examiner found that the fair and reasonable rate of tuition was 79 cents per student hour.
10. Both the Administrator of Veterans Affairs and the plaintiff took exceptions to the initial decision of the hearing examiner and requested a review by the board.- The board rendered a decision November 4, 1954, remanding the matter back to the Veterans Administration for a redeter-mination of a rate of tuition based upon the most representative cost data available. This decision stated in part :
* * * We are provided with no basis for rate determination other than cost data prepared by the Applicant. We would be as hesitant as was the Administrator to base a future rate of tuition on experience during.only the first 5 months of school operation as shown in the cost data upon which negotiation was commenced (for the period from May 31, 1949, through October 31, 1949). * * *
* * * As a review Board, we are in scant position to conduct the scrutiny of these expenditures which the Veterans’ Administration, through on-the-spot examination of books and records and questioning of authoritative sources, could and should have made as a prelude to rate determination.
* * * In order to bring the matter to satisfactory conclusion, we find it necessary to remand to the Veterans’ Administration with the instruction that a rate of tuition be determined for the period of Contract V3006V-662, based upon a detailed analysis and adjustment, as necessary, of the most representative cost data available — that which provides the most reliable basis for *824 determination of the reasonable and necessary costs of operation of the school during the period of the contract itself. Said determination shall be presented to the Applicant within 80 days of the date of this decision; and, should dissatisfaction remain, may be the subject of further appeal to this Board. * * *
11. On November 15, 1954, the VA wrote the plaintiff in part:
In view of the limitation of time for the determination of a new fair and reasonable tuition rate, it is suggested that the latest available cost data submitted for the period July 1,1949 to June 30,1950, be used as a basis for such new determination.
Statements of operation for the year ended June 30, 1950, had been prepared and certified by plaintiff July 28,1950, and were submitted to the VA about August 1,1950.
Plaintiff’s records were reviewed by VA representatives November 16 and 17,1950, and instruction hours were determined from vouchers paid.
A VA contract specialist made a determination of a fair and reasonable rate of tuition of 61.7 cents per hour of instruction, which was reported November 26, 1954. This determination was approved and adopted by the Administrator and the plaintiff was advised thereof on December 30, 1954. Plaintiff appealed to the board on January 10,1955, claiming a tuition rate of 95 cents per hour.
12. The matter was again referred to a hearing examiner by the board and hearings were held February 10 to 15,1955. The examiner filed an initial decision on June 29, 1955, in which it was held that the fair and reasonable rate of tuition should be 83 cents per hour of instruction.
Both parties filed exceptions to the examiner’s initial decision and submitted briefs in support of their respective contentions.
On October 12, 1955, the board rendered its decision in which it was held that the fair and reasonable rate of tuition should be 68.8 cents per hour of instruction. The tuition rate was determined upon 188,765 instruction hours for the period July 1, 1949 to June 30, 1950, with operating costs allowed as follows:
*825 (a) Teaching and related personnel_$41,113.25
(b) Consumable supplies_ 25, 351.14
(c) Depreciation_ 878.51
(d) Kent_ 14,092.85
(e) Building operation and maintenance_ 4,341.56
(f) Taxes and insurance- 4,433. 88
(g) Administrative expense- 17,684.41
(h) Advertising expense_ 8,935.80
Total costs_116, 831.40
(i)Profit (at l/9th of costs)_ 12,981.27
Total allowance_129, 812.67
Plaintiff does not contest the board’s allowances for items (c), (d), (e), and (f) and these items are not involved in the present proceedings. Neither is the number of instruction hours.
13. Plaintiff alleges in its petition that cost allowances by the board in its final decision of October 12,1955, for teaching, consumable supplies, administrative expense and advertising were erroneous and arbitrary and had the effect of reducing the fair and reasonable tuition rate.
The complete record established in the administrative proceeding, consisting of the transcript of testimony, exhibits offered by both the plaintiff and the Veterans Administration, all pleadings and briefs, the oral argument before the board, together with the decisions of the board, constitute the sole evidence submitted in this case. This record was received into evidence at a pretrial conference.
In the determination of the Administrator, as well as the final decision of the board, it was found that the plaintiff had operated its school at approximately 75 percent of the maximum capacity of authorized enrollment during the period under review. Certain expenses were adjusted by the board to what was held to be fair and reasonable costs in the prevailing circumstances.
14. Plaintiff corporation was organized by George Edel-man, his father Max Edelman, and Irwin H. Wexner. They paid in capital of $20,000. The capital stock was issued and held by them at 35 percent, 80 percent and 35 percent, respectively. They started negotiations with the State for *826 the approval of an upholstery school in 1947, incorporated in 1948, and the school was approved by the State May 16, 1949, for a 1,000-hour course at a tuition rate of $950. The maximum authorized enrollment was 80 students with a student-teacher ratio of 20 to 1, but approved enrollment was later increased to 100 students, effective May 15, 1951, for the same premises and facilities at 39-47 West 19th Street in New York City.
The State Board of Education required a cash bond of $10,000 which was not released until 1950, so that the school’s operating capital for the first year was only $10,000. The salary for each of the incorporators was first designated at $10,000 per annum, but this was later reduced to $8,333.32.
George Edelman, president, was about 28 years of age when the school was opened for enrollments and devoted his full time to the school activities. Max Edelman, vice president, was 71 years of age and had about 30 years of experience in the upholstery business. Neither had any other business interest. Irwin H. Wexner, secretary-treasurer, was a teacher until about 1950 or 1951 when he became assistant pi'incipal of Astoria (L. I.) Junior High School and performed his duties at the plaintiff’s school from 3:30 p. m. daily after his regular duties at the Astoria school were completed.
ENROLLMENT AND INSTRUCTION HOURS
15. Contract V3006V-662 contains the following provision with respect to payment for the course of instruction:
Payment made for a veteran enrolled is for a course of instruction and no deduction on account of reasonable absences shall be made from the tuition chargeable. Absences excused by the appropriate school authority not to exceed 5 percent of the total number of hours of instruction as set forth herein are considered reasonable and. shall be permitted without deduction in the total tuition charge.
The Contractor may furnish make-up instruction for excused absences in excess of the amount set forth above as “reasonable absences.”
*827 When provided, make-up instruction must be given under the direct supervision of qualified instructors at the rate of one hour of make-up for each hour of absence. Make-up instruction will be charged at the hourly rate of instruction established herein, provided that the Contractor will not be compensated for make-up instruction in cases where students have not exceeded the 5-per-cent reasonable absences set forth above.
The class schedule provided a morning session of 5 hours a day, 25 hours a week, for completion in 40 weeks, an afternoon session for the same period, and an evening session for 4 evenings a week, 12 hours a week, for completion in 83% weeks. By supplement No. 1, effective July 10, 1950, two 12-hour evening sessions were provided weekly, one for 3 evenings at 4 hours each and one session for 2 evenings and Saturday morning at 4 hours for each class.
16. Instruction hours for the month of August 1949 represented approximately 96 percent of authorized maximum enrollment, but thereafter new enrollments were precluded for the remainder of the period under review, until June 1950 when the plaintiff had completed its first year of operation under Public Law 266, 81st Congress, which was approved August 24,1949 (63 Stat. 631, 653).[3] The instruction hours for January 1950 represented approximately 85 percent of authorized maximum enrollment as a result of dropouts. Then by April 30, 1950, all-day students who had enrolled prior to July 25,1949, were graduated so that the instruction hours for May 1950 represented only about 32 percent of authorized maximum enrollment.
A tabulation of instruction hours for the period under review was furnished by the plaintiff and is summarized monthly as follows:
*828 Year Month Instruction hours provided veterans
Attendance Absences Total hours
1949 July.-_ 14,438 402 14,840
August_ 21, 029 1,059 22,088
September.. 18, 784 1,207 19,991
October_ 18,168 1,186 19,354
November.. 15, 982 1,760 17,742
Subtotal.. 88, 401 5,614 94,016
December.. 15, 976 1,604 17,580
1950 January.... 16, 729 1,115 17,844
February... 14, 468 1,013 15,481
March_ 15, 983 690 16, 673
April. 9,513 324 0,837
May_ 6,835 117 6,962
June_ 9,152 382 9,634
Subtotal. 88, 656 5,245 93,901
Total. 177,057 10,859 187,916
The payment vouchers for the above period show that the plaintiff was paid for 188,765 instruction hours for veteran training and the parties have agreed that is the proper figure for the determination of hourly tuition rates on allowable costs for the year ended June 30,1950. This represents an average of approximately 15,730 instruction hours a month or about 75 percent of authorized maximum capacity for that period, exclusive of holidays.
17. During the period of the claim herein from December 1,1949 to October 28,1952, the plaintiff was paid for 668,066 hours of instruction to veterans, or an average of 19,088 hours per month. The average monthly hours paid for during the cost period July 1, 1949 to June 30, 1950, was 15,730. This represents 82.4 percent of payment hours during the claim period.
The plaintiff had enrolled no nonveteran students during the operation of the school to June 30, 1950, but starting in late 1950 or early 1951 nonveteran students were enrolled and paid $750 for the 1,000-hour course in upholstery, representing a tuition rate of 75 cents per hour of instruction. The maximum nonveteran enrollments were between 20 and 30 students, or approximately 20 percent of total enrollment.
Commencing in April 1951, the plaintiff enrolled students, other than veterans, in a correspondence course, and during *829 the following year some 73 students were enrolled in this correspondence course. Three dropped out.
The education department of the State of New York approved an increase in the maximum enrollment for the plaintiff’s school from 80 to 100 students, effective May 15, 1951, for the same premises and facilities. Maximum enrollment was obtained between May 15,1951 and July 27,1951, after which date World War II veterans were no longer authorized to initiate a course of training under Public Law 346, as amended.[4] The plaintiff’s expenditures for rent, facilities, teachers and administrative expenses were not proportionately increased by the increase in enrollment after June 30,1950.
By reason of the lack of new enrollments after July 1951 and the completion of the course by students who had previously enrolled, the plaintiff found that it could no longer operate the school economically and it was closed October 28, 1952. A suitable tenant was found to take over the leased premises November 1,1952.
Considering the total enrollment after December 1, 1949, including nonveteran students, it is reasonable to conclude that the average enrollment during the cost period for the year ended June 30, 1950, was not more than 75 percent of the actual enrollment during the claim period.
*830 TEACHING AND RELATED PERSONNEL
18. In its cost data submitted for the year ended June 30, 1950, the plaintiff claimed teaching salaries of $55,532.56, consisting of the following:
Myron Bernstein, director (87.5 percent of $8,265)_$7,231. 88
George Edelman, president (75 percent of $9,583.24)_7,187.43
Instructors_37,121.25
Supply attendant- 2,102.00
Clerk-typist_ 1, 890.00
55,532.56
The salary claimed for George Edelman represented payments from May 31, 1949, and plaintiff concedes that the correct payment for the year ended June 30, 1950, was $8,333.32. Plaintiff now claims that all of Bernstein’s salary should be allocated to teaching, and $6,249.99 of the salary of Edelman, adjusting the total amount claimed to $55,628.24. This latter amount was actually paid by plaintiff.
The Veterans Education Appeals Board excluded the salaries of Bernstein and Edelman from'the teaching classification, but allowed Christmas bonuses of $385, which item is included in the above salaries of others, and allowed $41,113.25.
19. The regularly assigned instructors were paid for 11,556 hours and the student-teacher ratio was approximately 16 to 1 for the 188,765 instruction hours paid for during the period. Some teachers taught only in the morning sessions, some in both day sessions and some taught evening classes only. Neither Bernstein nor Edelman had any regular class assignment.
As director, Mr. Bernstein was the administrative head of the school and responsible to the State Board of Education for its proper operation. But the plaintiff contends that approximately three-fourths of his time was engaged in teaching and one-fourth in supervising instructors and the school curriculum.
George Edelman was engaged in the hiring of employees, purchasing of supplies, did all bookkeeping during the period and the preparation of cost data and part-time teaching. The plaintiff contends that three-fourths of his time was *831 engaged in teaching and one-fourth in administrative duties. The part-time teaching performed by Bernstein and Edel-man was in substitution for regular teachers and the conduct of classes of make-up work for students who could not fit into the regular classes of instruction.
The contract allowed reasonable absences of 5 percent without any deductions for the payment of instruction hours for veterans as noted in finding 15. Actual absences of 10,859 student hours were only slightly in excess of allowable absences, so that required make-up time would be less than 1 percent of the 188,765 instruction hours paid for during the period.
Regular instructors were allowed vacation with pay. Teachers’ vacations were authorized and taken during April, May and June 1950 when enrollment of veteran students was only about one-half of normal enrollment.- There is no satisfactory evidence of substitute teaching for other absences of teachers during the year.
The determination of the board that $41,113.25 is a fair and reasonable allowance for necessary teaching and related personnel for the year ended June 30, 1950, is supported by substantial evidence and is fair and reasonable for the enrollment of students during that year.
CONSUMABLE SUPPLIES
20. The plaintiff made purchases of consumable supplies, other than tools and equipment for tool kits, in the sum of $36,400.44 during the year ended June 30, 1950. It also claimed a cost of $2,938.44 for 188 sets of tool kits on the basis of the assembled unit cost of $15.63 for each 1,000 student hours of instruction, making the total cost $39,338.88.
Sufficient tools were purchased before the school opened and kits were assembled for assignment to each student upon enrollment. By October 31, 1949, the plaintiff had assembled some 300 tool kits. Upon the successful conclusion of the required training each student was given the kit issued to him as part of the cost of the tuition.
Plaintiff’s claim for consumable supplies included purchases of $12,401.63 in June 1950 but no inventory of the unused supplies was furnished. Thus, plaintiff’s claim for *832 consumable supplies represented total purchases for the period, rather than consumable supplies actually used in operating the school.
Plaintiff’s fiscal year ended April 30. Purchases from the beginning- of operations to April 30, 1950, were $34,-970.19 The inventory recorded in the account of April 30, 1950, was $10,864.15. The net cost of supplies consumed for the period of 11 months ended April 30, 1950, was $24,-106.04.
From the beginning of operations to April 30, 1950, the plaintiff was paid for 179,382 student hours of instruction. The cost of supplies consumed was equivalent to 13.43 cents per hour. By applying this rate to 188,765 hours of instruction for the year ended June 30, 1950, the cost of supplies is $25,351.14, which sum was allowed by the board as a fair and reasonable cost.
21. The plaintiff contends that of the 179,382 student hours paid for as of April 30, 1950, 86,555 would represent instruction hours for graduate students who had been given tool kits upon graduation, but that 92,827 hours represented instruction for undergraduate students who were still enrolled April 30, 1950. Tool kits, which were issued to students for use during training, were retained by the school until graduation and would be included in its inventory. Since its inventory of October 31, 1950, listed all tool kits at the cost price of $15.63, the plaintiff presumed that this same practice was followed for the April 30,1950, inventory. But since 92,827 hours of instruction had been given students who had not yet graduated, the tool kits being used by them should be amortized at $15.63 per 1,000 hours of instruction, and therefore the April 30,1950, inventory would be overstated in the sum of $1,450.88.
The inventory of October 31,1949, was prepared by George Edelman in connection with cost data submitted for the 5 months ended October 31,1949. It was an interim inventory and not for the purpose of a profit and loss statement. Plaintiff employed an accountant to prepare monthly summaries of its book accounts and postings. No list of the inventory of April 30, 1950, was available which would show the unit pricing of the inventory taken. It is reasonable to conclude *833 that the inventory entered in the plaintiff’s books April 30, 1950, was properly evaluated. ■
The inventory of October 31,1949, contained chair frames and stools which were used by students in training up to that time, but were still available for use in later shop training.' These used units were carried in the inventory at $407. The original cost was $2,204.29, so that $1,797.29 of the cost of these units had been written off, although they were still available for use during a later period. Had the same practice been followed in compiling the April 30,1950, inventory, the cost of such chair frames would be charged largely to the first year of operation, thereby reducing the charges for later periods of operation.
There is no basis found for any increase in the allowance for consumable supplies. On the contrary, the amount allowed by the board is the maximum that could be reasonably determined, and is supported by substantial evidence.
ADMINISTRATIVE EXPENSE
22. The cost data submitted by the plaintiff for the year ended June 30, 1950, contained administrative expenses of $31,396.37. This sum included administrative salaries of $26,166.91. The salary schedule allocated one-eighth of the salary of Bernstein, one-fourth of the salary of George Edel-man and all of the salaries of Max Edelman and Irwin H. Wexner. The salaries claimed for George Edelman, Max Edelman, and Irwin Wexner were overstated at $9,583.24. Plaintiff now claims salary for these officers at $8,333.32 each. A summary of the adjusted claim for salaries follows:
George Edelman, president (25 percent of $8,333.32)_$2, 083.33
Max Edelman, advisor_ 8, 333. 32
Irwin Wexner, registrar_ 8, 333.32
Sliirley Fidel, secretary_ 2, 380. 00
Other clerks (part time)_ 1,191.50
Total salaries_ 22, 321.47
Since the salary apportionments for Myron Bernstein, director, and George Edelman, president, were excluded from the teaching classification, the total salaries, other than teaching, would be $36,836.46. The salary payment to the three *834 owners of stock in the corporation was $24,999.96 per annum and, with the payment of $8,265 to Mr. Bernstein, amounted to $33,264.96 for the year.
The board found that the administrative staff was overburdened with higher paid officials who engaged in handling administrative details normally performed by a clerical staff.
The board allowed $15,000 for administrative salaries, without allocating such allowance among specific individuals. In making this determination the board stated:
It is our judgment on the evidence of record as to the size of the school, its student body, its hours of operation, and the nature of the duties here involved, that the sum of $5,000 reasonably should be sufficient to obtain the performance of the necessary services on the clerical level, and $10,000 should suffice for the executive function, including the duties of directing the school, registering students, and such supervision and coordination of instruction as would be required and has not been provided for in the teaching schedule. * * *
Other administrative expense was allowed in the sum of $2,684.41, making the total allowance by the board in this classification $17,684.41.
23. Max Edelman advised his son, George Edelman, in matters pertaining to the purchase of supplies. His most valued contribution to the school operation was his knowledge of how, when, and where to purchase supplies. He also acted as advisor in shop training so that such training would simulate actual shop practice. He was 71 years of age when the school started. There is no satisfactory evidence that he was actually engaged at the school any substantial amount of time.
Irwin Wexner was engaged at the school from 3:30 p. m. until closing time as registrar. He was in charge of enrollment of students and handled policy matters relating to students, advertising, record keeping, and the office management. When he was not at the school his work was regularly performed by the secretary, Miss Fidel.
The duties regularly performed by George Edelman are reported in finding 19. The administration of the school, after the approval of its facilities and curriculum, would consist largely of handling details normally performed by *835 clerical employees under tbe school director. Plaintiff’s actual expenditure for administrative clerical help was $3,571.50.
The enrollment during the cost period was not more than 75 percent of the average enrollment for the entire period of the claim from December 1, 1949. The plaintiff’s president conceded that administrative and other fixed expenses would not be increased by increased enrollment.
It is reasonable to conclude that the board’s allowance of $15,000 for administrative salaries for the year ended June 30, 1950, was fair and reasonable and is supported by substantial evidence.
24. The board allowed, as claimed, the amounts of $65.15 for depreciation of office furniture and equipment, $583.54 for postage and stationery, and $607.97 for telephone and telegraph expense.
The plaintiff’s cost data contained $257.10 for travel and entertainment expense. Entertainment expense of $182.10 was disallowed and the board allowed the travel expense of.$75. Entertainment was not a necessary expense in operating the school.
25. The plaintiff claimed $2,332 for legal and accounting expenses for the year. The plaintiff had no litigation during the year. The amount expended included $1,050 for legal service during the period from 1947 to May 15, 1949, for the organization of the company and negotiations with the State for the authorization and approval of the school. It also included the payment of $800 to Berson, Halperin, and Krauss for accounting services and negotiations for the first contract. The VA had determined and proposed a tuition rate of 50 cents an hour for the first contract period of 6 months of operation, but this was revised by negotiations to 70 cents per hour. This item was not related to the operation of the school and was a nonrecurring item.
Plaintiff’s legal and accounting expenses for the year ended June 30, 1950, consisted of $420 for monthly summaries and postings of the books at $35 per month, payment of $27 to an attorney in connection with an injury to a student and another item of $35, which total $482.
*836 In June 1951 tlie plaintiff paid an attorney $1,200 for negotiations with State officials to procure an increase in authorized enrollment from 80 to 100 students. The increase was finally approved effective May 15, 1951. Since these negotiations represented continuing efforts to obtain an increased enrollment, some portion of this payment was reasonably attributable to the cost period. This payment was also considered by the board, although it cannot be properly construed as an operating expense, but as part of the cost of perfecting the school’s maximum enrollment.
The board allowed $1,200 for legal and accounting expenses as a normal anticipated requirement, whereas the Administrator had determined a fair and reasonable allowance of $1,000. Considering that the regular accounting practice is to write off organizational expense over the early years of operation, the allowance of $1,200 by the board is fair and reasonable and is supported by substantial evidence.
26. The plaintiff’s expenses for interest and bank charges for the year were $745.64, of which $50 represented bank charges. The necessity for bank loans upon which interest was paid during the period resulted from an inadequacy of capital invested and, in part, from the payment of salaries to proprietary officials in excess of compensation commensurate with the duties performed by them.
The board allowed the bank charges of $50 in harmony with the determination of the Administrator, but disallowed any interest as ordinary and reasonable expense. The board’s determination is sustained by substantial evidence.
Discount expense of $147.46 for the prompt payment of monthly vouchers rendered to the VA is similar iff character to interest expense and was disallowed by the board for the same reason. The plaintiff elected to take such discounts. They were not required costs. They are properly disallowed.
27. The plaintiff’s cost data contained an account for miscellaneous expenditures of $490.60. The board excluded the sum of $387.85 for the purpose of computing a tuition rate, because it consisted of expenses for a Christmas party, a payroll theft and contributions, which were not considered normal costs of operating the school. It allowed $102.75 for *837 magazine subscriptions, association dues, and medical expense for minor injuries on the school premises.
The board allowed administrative expense of $17,684.41, representing 23.5 percent of items (1), (2), (5), and (6) of the cost classifications outlined in finding 6. This sum is determined as fair and reasonable from all of the evidence submitted. It consists of the following:

MnMng Amount

23 Administrative salaries_$15,000.00
24 Depreciation of office furniture and equipment_ 65.15
24 Postage and stationery_ 583.54
24 Telephone and telegraph expense_ 607.97
24 Traveling expense_ 75.00
25 Legal and accounting_ 1,200. 00
26 Bank charges_ 50.00
27 Dues, subscriptions and medical expense_ 102.75
ADVERTISING
17, 684. 41
28. The cost data submitted by plaintiff for the year ended June 30,1950, contained advertising expense of $8,271.03, and consisted of $7,132.46 for newspapers and magazines and $1,138.57 for advertising data mailed direct to individuals for the purpose of obtaining enrollments in the school. Plaintiff’s books contained a credit memorandum of $1,000 against advertisement payments prior to July 1, 1949, so that the gross book expense for the year was $9,271.03.
The VA contract negotiator allowed advertising expense of $8,935.80, which was adopted as fair and reasonable by the Administrator. Book charges of $335.23 were excluded by the VA, including a donation of $144 for a veterans’ association. The board sustained the determination of the Administrator, and allowed advertising costs of $8,935.80 as fair and reasonable.
Advertising expense is, in effect, a prepaid cost. That is, the anticipated benefits and actual results are realized during a period after such costs are incurred. In a going concern where a consistent policy is pursued, advertising expense paid during a fiscal period will usually represent the normal cost for this class of expense. There is no satisfactory evidence of what plaintiff’s normal advertising expense would be.
Plaintiff’s enrollment of veterans was restricted under *838 Public Law 266, effective August 24,1949, so that the results obtained from most of the advertising costs during the period would be realized in the period that followed. Enrollments during July and August 1949 would result, substantially, from June 1949 advertising. Since plaintiff’s advertising costs cover a period largely within the first year of operations and with enrollment at approximately 76 percent of normal enrollment in the following periods, the hourly cost of advertising for this period appears excessive. However, on the evidence before the board, its determination and allowance of $8,986.80 is fair and reasonable.
29. The Yeterans Education Appeals Board found that the sum of $116,831.40 represented plaintiff’s fair and reasonable cost of operating the school for the year ended June 30, 1950, and with a profit allowance of $12,981.27, the board allowed $129,812.67 for 188,765 hours of instruction and training to veterans, or 68.8 cents per hour.
Considering that salary payments to the proprietary officials were not justified for the services required and rendered by them and that fixed charges and certain other costs were abnormally high in comparison with the enrollment during the period, the determination of the board is found fair and reasonable for the purpose of the tuition rate for contract V3006V-662, and later contracts.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is therefore dismissed.

 The Veterans Tuition Appeals Board was appointed by the Administrator under Public Law 266 but was superseded by the Veterans Education Appeals Board whose members were appointed by the President pursuant to Public Law 610 which repealed Public Law 266. Plaintiff’s appeal was considered by the new board.

 This figure is based on plaintiff’s evidence and ¿requested findings. The petition claims $152,641.67.

 TMs Act was known as the Independent Offices Appropriation Act 1950 and provided: “That no part of this appropriation for education and training under title II of the Servicemen’s Readjustment Act, as amended, shall be expended subsequent to the effective date of this Act for subsistence allowance or for tuition, fees, or other charges in any of the following situations:
“(1) For any veteran for a course in an institution which has been in operation for a period of less than one year immediately prior to the date of enrollment in such course unless such enrollment was prior to the date of this Act

 Section 400 (b) of the Act of June 22, 1944, 58 Stat. 288, known as Public Law 346, as amended, (38 U. S. C. Chap. 12A, Part VIII) providing for the education and training of World War II veterans, provided in part:
‘U. * * * That such course shall be initiated not later than four years after either the date of his discharge or the termination of World War II, whichever is the later: Provided further, That no such education or training shall be afforded beyond nine years after the termination of World War II.
“12. For the purposes of this part, World War II shall not be considered as terminating, in the case of any individual, before the termination of such individual’s first period of enlistment or reenlistment contracted within one year after October 6, 1945.”
Joint Resolution approved July 25, 1947 (61 Stat. 449, 451, 454) provides in part:
“Sec. 3. In the interpretation of the following statutory provisions, the date when this joint resolution becomes effective shall be deemed to be the date of the termination of any state of war heretofore declared by the Congress and of the national emergencies proclaimed by the President on September 8, 1939, and on May 27, 1941;
"Section 400 (b) of the Act of June 22, 1944 (58 Stat. 288), as amended, except paragraph 12 of such section