Davis, Judge,
delivered the opinion of the court:
Plaintiff, an Illinois corporation, brought this suit pursuant to House Resolution No. 666, 85th Cong., 2d Sess. (1958), which referred H.R. 10297 (a bill for plaintiff’s relief) to this court in accordance with 28 IJ.S.C. §§ 1492, 2509.[1] From 1948 to 1952, plaintiff operated an automotive trade school in Chicago, furnishing education and training to veterans under the Servicemen’s Readjustment Act of 1944 (Public Law 846), 58 Stat. 284 (as amended).[2] In its original form, the Act allowed as payment to eligible schools[3] the “customary cost of tuition,” but it made no specific provision for newly-organized educational institutions having no “customary” tuition rate. To close this gap, the Veterans Administration, invoking its general authority under Public Law 346, promulgated a regulation (which has been held valid) known as Change 4 to Manual 7-5,[4] effective July 1, 1948.[5] See Metropolitan Training Center, Inc. v. Gray, 188 F. 2d 28 (C.A.D.C., 1951); West Coast University v. United States, 162 Ct. Cl. 310, 313-14, 321 (1963). That regulation required the VA to enter into *108 contracts for “fair and reasonable compensation” with, schools established after the enactment of Public Law 346, a majority of the students of which were veterans.[6] Plaintiff fell into that category and had therefore to submit financial statements and cost data to the VA so that a fair 'and reasonable tuition rate might be determined and contracts negotiated on that basis.
Public Law 266, 63 Stat. 631, 663 (1949), formally incorporated the “fair and reasonable” standard, for institutions such as plaintiff’s, into the Servicemen’s Readjustment Act, but added that where “one or more contracts providing a rate or rates of tuition have been executed for two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition.” Thus, after two years, the latest level of compensation was to remain fixed for the same courses of study covered in prior contracts.
Under these provisions, the plaintiff and the YA executed the following contracts while the school was operating:

The first two agreements (V3028V-498 and V3028V-1067) .are especially significant because they were negotiated pursuant to Change 4 and the second contract was the source •of the constant rate, the customary cost of tuition incorporated in later contracts.
*109 Plaintiff urges that the various agreements did not afford it adequate remuneration and that it was forced to close its school. Veterans were accepted for training until April 1952; shortly afterwards, the institution shut its doors. Through this Congressional reference plaintiff seeks recovery for (i) the losses (based on actual costs) plaintiff says it incurred in performing the contracts, as well as the deprivation of future profits which it says it might have made had its school stayed open and (ii) the difference between the rates of tuition agreed to and paid under the various contracts (which plaintiff insists were not fair and reasonable) and what would be fair and reasonable rates.
A. We note first that plaintiff has no legal claim because it failed to exhaust its administrative remedies. Public Laws 266 and 610 provided for administrative appeals to boards of review.[7] Plaintiff takes issue with each of the contracts it executed, but as to none did it press an administrative appeal to completion. It did file an appeal to the Veterans’ Education Appeals Board, but only on Supplements 1 and 5, and that appeal was dismissed for lack of prosecution. In the absence of proper resort to these tribunals, plaintiff can make no claim in court. Feener Technical Schools, Inc. v. United States, 136 Ct. Cl. 94, 102, 141 F. Supp. 777, 782 (1956); Friedman v. United States, 159 Ct. Cl. 1, 11-13, 310 F. 2d 381, 387-88 (1962), cert. denied, 373 U. S. 932 (1963). Plaintiff, however, feels that it has an excuse; it says the VA misled it into believing that it would not get tuition payments pending appeal, and that it was in such a tight cash position that it could not take an appeal under those conditions. Actually, the law did provide for payments pending appeal (see finding 14) and there is no adequate showing that the VA told plaintiff otherwise or that plaintiff was in fact 'misled. It seems unlikely that for the whole period from 1948 to 1952 the plaintiff would or should *110 have continued under the misapprehension it says was engendered by the VA representatives. This is especially so since one of plaintiff’s chief officers was an attorney. If plaintiff and its officers were misled, as contended, then their own negligence must have played a substantial part in their plight. There is no legal or equitable reason to excuse plaintiff’s failure to pursue its administrative remedies.
B. If plaintiff’s failure to pursue the established remedies be disregarded, we come to the question of whether, under the fair-and-reasonable-compensation standard, the VA acted improperly in establishing the tuition rates for the various contracts. On that issue, the Trial Commissioner has made complete and detailed findings upholding, with minor divergencies, the VA determinations. The net of the report is that plaintiff is entitled, legally or equitably, to nothing more than it received.[8] Plaintiff’s major exceptions relate to the Commissioner’s agreement with the VA in the disallowance or adjustment of certain items of cost submitted for the purpose of establishing the tuition rates. We find none of these exceptions well taken. Plaintiff has utterly failed to bear its normal burden of showing errors in the VA’s determinations.
1. For the first contract (V3028V-498), plaintiff submitted a schedule of estimated costs including $55,000 for tool kits and an amount representing depreciation of leasehold improvements on a five-year scale. The VA disallowed the $55,000 item and substituted another amount for depreciation over a five-year period. In addition, it required that the leasehold improvements be depreciated over ten years, not five as plaintiff wished. These adjustments, accepted by the Commissioner, are challenged on the ground that (a) since plaintiff intended to give the tool kits to the students at the end of the course, their entire cost should have been *111 included, and (b) since plaintiff’s lease extended for only five years, the leasehold improvements should' have been depreciated over that lesser period.
The plaintiff’s evidence is insufficient for the court to find that the tool kits were in fact given outright to the students or that the agency was required to treat them in that fashion. While the VA could pay for equipment given to students, it was within its discretion where to draw the line. Massachusetts College of Pharmacy v. United States, 141 Ct. Cl. 775, 776-77 (1958). Depreciating the cost of the tool kits, which were in no sense consumable supplies, has not been shown to be improper.
The same is true of the requirement that the leasehold improvements be depreciated over ten years, rather than the five-year term of the lease. The VA contract officer followed the schedule of depreciation used by the Internal Revenue Service. That gave his determination solid footing. It was impossible to foresee exactly how long plaintiff’s school would continue at the leased premises; the life of the current lease was some evidence of the possible duration of plaintiff’s use of the building, but was by no means controlling. The contract officer used the best available general gauge and his action was not erroneous.
2. Contract V3028V-1067, the second one, covered the period from January 1, 1950 to December 31, 1950. It is important because the tuition rate established for that period became the “customary” rate.[9] As instructional costs plaintiff claimed $60,628 for teaching salaries and $12,929.51 for related salaries. The VA contract officer reduced these figures to $38,084.21 and $6,243.47. Plaintiff says this was erroneous, but has not proved its own figures. The VA revisions were made through a careful audit of plaintiff’s payroll cards and withholding statements, and are well supported. It is also said that the VA should not have disallowed $517.63 for instructors’ traveling expense. Even though plaintiff may have incurred such an expense we do not know why the VA should be required to pay for it. Plaintiff balked at proving, either to the VA contract officer *112 or to this court, bow traveling expenses for instructors were related to the performance of their teaching duties. In this instance, as throughout the case, the ordinary burden of proof weighing upon every claimant has not been met by the plaintiff.
Included in plaintiff’s figures for “consumable supplies” were shop tools, shop equipment, leasehold improvements, and office and classroom equipment. The contract officer did not permit these items to remain in that classification and thus charged off in a single year. He properly reclassified them into depreciable accounts. Plaintiff says this was wrong because much of the equipment was pilfered or damaged and had to be replaced in eight months or a year. Again, plaintiff does not tell us how much money the pilfering or loss cost; clearly all of the equipment could not have been stolen or lost in a year. There is no reason to believe that the amortization allowed did not adequately take this damage into account. In addition, any pilfering or other damage which was more than de minimis was a matter for the school’s internal control. If it were a grave problem, the plaintiff should have taken measures to reduce the thefts or breakage to normal limits. The defendant did not agree to be an insurer of uncontrolled large-scale losses.
Complaint is made because $1,983.32 for telephone expense was not permitted to be included, but plaintiff incorrectly placed that amount under the heading of “Utilities”; it was actually an administrative expense rightly placed in that category by the VA contract officer. In that connection, plaintiff alleged administrative expenses of $22,851.66 and was allowed only $10,928.11. This raises no serious question. As the Trial Commissioner pointed out, the contract officer limited administrative expenses in accordance with the prevailing policy under Change 4, the governing regulation. Plaintiff has not shown itself entitled to better treatment than called for by the standard policy.
The last matter under the second contract is advertising or promotional expense.[10] No allowance was given for the sum of $6,526.33, paid out in traveling expenses for Joe *113 Louis, the former heavyweight champion. Mr. Louis was the honorary president of the school; he traveled and made addresses to veterans in order to recruit students. Change 4 recognizes a reasonable advertising expense and the contract officer did not delete amounts for brochures, circulars, pamphlets and newspaper ads (he even allowed expenses not submitted). He did not, however, consider traveling expenses for Joe Louis a part of a reasonable advertising-figure for a school of this kind. That type of expense was not normal for trade schools, which usually advertise in newspapers, magazines, and trade journals. The costs of having a celebrity promote the advantages of plaintiff’s school could be considered as justly to be borne by the institution. Those expenses would be made up, it was fair to believe, by the greater number of students who would come to plaintiff’s school as a result of Joe Louis’ efforts. Moreover, his trips were usually made “in conjunction with other interests and activities,” not related to the school. Finding 12(h). No allocation was attempted by plaintiff and, therefore, the contract officer had another reason for disallowing the traveling expenses.[11]
Since we reject plaintiff’s individual assaults on the make-up of the tuition rate for the second contract, we must hold the rate to have been proper under the standards of the statute and the regulation. That rate was continued, under the mandate of Public Law 266, for contracts V3028V-1399 and V3028V-1822. We have no right, and there is no warrant, to set aside or disregard such a rate, validly fixed pursuant to law. See Germain School of Photography, Inc. v. United States, 150 Ct. Cl. 841, 281 F. 2d 452 (1960); McSweeney Trade School, Inc. v. United States, 131 Ct. Cl. 445, 127 F. Supp. 591 (1955); and the discussion in part C of this opinion, mfra.
3. Supplements 1 and 5 to contract V3028V-1399 were agreements negotiated and executed for a course in electric arc and oxyacetylene welding. These agreements were not covered by the constant (or customary) rate because the course was new. The same procedures for determining fair *114 and reasonable compensation involved in the first two contracts were also utilized as to these later agreements. Plaintiff takes the same stand, with respect .to the supplements, on the items of instructional costs and administrative expense which we have already considered. The answers are likewise the same.
4. The Trial Commissioner noted that certain items of cost were incorrectly omitted by the VA. These were additional costs for taxes and insurance for Supplement 1 and projected student-hours of instruction for Supplement 5. Accordingly, the Commissioner has recommended an adjustment of the rates for the supplemental agreements which indicates that plaintiff is entitled to an additional $3,867.26. We agree with those recommendations and reject defendant’s exceptions.
5. On the whole, plaintiff is now entitled to nothing, either legally or equitably, under its various contracts. It should have received $3,867.26 more under the two supplements, and defendant withheld $10,162.79 which was admittedly owing (see finding 24). But plaintiff received overpayments of more than $15,000 (finding 24) ,[12] On striking a final account, defendant owes nothing to plaintiff (see footnote 8, supra).
C. Plaintiff also appears to claim that, regardless of the reasonableness of the tuition rates, the school is entitled to be reimbursed for its actual losses and to be paid a reasonablé profit. Legally, there is, of course, no basis for such a demand. The school can recover only a fair and reasonable rate of tuition. The entire scheme established by statute and regulation precludes recovery of the actual costs incurred in the performance of the contract. Hemphill Schools, Inc. v. United States, 146 Ct. Cl. 559, 561-63, 570 (1959). The rates for the negotiated agreements are fixed in advance, from prior cost data or estimates. The actual outlays of the first contract between a veteran-training school and the VA are taken into account in arriving at a possible new tuition rate for the second contract, but no payment is allowed for actual costs or losses during the first *115 contract. After two successive years, the most recent fixed-rate (usually that of the second agreement) covers future periods — irrespective of actual, estimated, or projected costs. Germain School of Photography, Inc. v. United States, 150 Ct. Cl. 841, 281 F. 2d 452 (1960); McSweeney Trade School, Inc. v. United States, 131 Ct. Cl. 445, 127 F. Supp. 591 (1955). The burden is upon the educational institution to manage its affairs so as to control expenses and maintain whatever level of profit its own industry will produce.[13]
A fortiori, plaintiff may not have as an item of damage the profits it asserts would have been made had it stayed open. Since the VA did no material wrong in setting the rate, the plaintiff cannot clamp the school’s closing onto the defendant’s back. In the absence of a legal injury, the Government could not be legally responsible for plaintiff’s failure to make continued profits. Moreover, even if there were a breach of contract, profits would not be recoverable on this record. Plaintiff has failed to prove that it would have been ready and able to carry on continued performance, or that it would have reaped a profit. Without such proof, anticipatory profits cannot be recovered. United States v. Penn Foundry & Mfg. Co., Inc., 337 U.S. 198 (1949). In addition, plaintiff has not brought itself within the other hornbook rule that consequential damages are not recoverable unless shown to have been foreseeable by the breaching party when the contract was made. Compare Globe Ref. Co. v. Landa Cotton Oil Co., 190 U.S. 540 (1903), with Krauss v. Greenbarg, 137 F. 2d 569 (C.A. 3, 1943) and Restatement, Contracts § 330. While consequential damages have been granted by this court against the Government, recovery for a mere “profit expectancy,” apart from the benefits of the particular bargain, has been refused. Torres v. United States, 126 Ct. Cl. 76, 79, 112 F. Supp. 363, 365 (1953). See, *116 also, Oliver-Finnie Co. v. United States, 150 Ct. Cl. 189, 204, 279 F.2d 498, 508 (1960).
Viewed through “equitable” lenses, this part of the claim appears no healthier. Plaintiff does not suggest any good reason why it, unlike the other VA contractors, should be reimbursed by the Government for losses and for failure to make profits. In particular, plaintiff has made no showing how the Government, acting through the VA, caused the purported losses. “The most liberal interpretation of an ‘equitable’ claim in a Congressional reference would not suggest recovery against the United States unless the fault of the Government contributed materially to the loss.” Ralph Feffer & Sons v. United States, 166 Ct. Cl. 506, 516 (1964). This record does not reveal a ground for finding that the Government’s actions caused losses while the school was operating or that the Government caused the school to close. For all we know, the claimed losses occurred (and the school had to close) because of mismanagement, inefficiency, or insufficient students in the area. There is no justification in this record for saddling the Government with the misfortunes plaintiff says it suffered.
For these reasons, we think that plaintiff is without a legal or an equitable claim against the United States.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Representatives pursuant to House Resolution No. 666, 85th Congress, 2d session.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. During the second session of the 85th Congress, the following bill was introduced in the House of Representatives (H.R. 10297):
A BILL
For the relief of the Chicago School of Automotive Trade [s], Incorporated.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress *117 assembled, That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $146,105.78 to the Chicago School of Automotive Trade[s], Incorporated, in full settlement of all claims against the United States. Such sum represents losses on alleged contracts between the said company and the Veterans’ Administration for the period December 1948 to April 1952: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act sham be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
On August 13, 1958, the House of Representatives, pursuant to 28 U.S.C. sections 1492 and 2509, adopted H. Res. 666 as follows:
RESOLUTION
Resolved, That the bill (H.R. 10297) entitled “A bill for the relief of the Chicago School of Automotive Trade [s], Incorporated”, now pending in the House, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the House of Representatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
2. On February 19, 1959, plaintiff filed a petition in the Court of Claims asking the court to find the difference between the tuition rates fixed in contracts executed by plaintiff and the Veterans Administration pursuant to the Servicemen’s Readjustment Act of 1944 (58 Stat. 284) and what it alleged were fair and reasonable rates. The plaintiff also sought a determination of what was legally or equitably owing to it.
3. Plaintiff, Chicago School of Automotive Trades, Inc., *118 is a corporation organized for profit under the laws of the State of Illinois, and during a period from 1948 to 1952 was engaged in the business of operating a trade school in the city of Chicago. Courses of study and training were given in automotive mechanics and other related subjects.
4. Plaintiff school was approved by the State of Illinois to furnish education and training to eligible veterans under the Servicemen’s Readjustment Act of 1944, as amended, Public Law 346, 78th Congress, 58 Stat. 28A-287 (38 U.S.C. 703a and Chap. 12A, Veterans’ Regulation No. 1(a), Part VIII). Veterans were accepted for training until April 1952 and the school was closed shortly thereafter.
5. Plaintiff entered into written contracts with the Veterans Administration with respect to the training of veterans pursuant to Public Law 346, as follows:

6.Effective July 1, 1948, the Veterans Administration issued Change 4 to Manual 7-5 (38 C.F.R. 21.530), the controlling agency regulations, which required that tuition rates would henceforth be determined on a fair and reasonable basis predicated upon detailed financial statements, hereinafter referred to as “cost data,” to be submitted by all schools operated for profit established subsequent to *119 June 22, 1944, and having a majority of students who are veterans. Such schools did not have a customary cost of tuition. Change 4, which was still in effect as of May 1, 1950, reads in pertinent part as follows:
§ 21.530. Determination of fair and reasonable compensation. The determination of fair and reasonable compensation by the manager, as in the case of courses of less than 30 weeks, or courses of 30 weeks or more in institutions other than nonprofit will require the submission by the educational or training institution of detailed, certified financial statements snowing the most recent actual cost experience of the institution for the specific courses involved, _ including cost data on the items of expense which will be used for the determination of fair and reasonable compensation, the basis on which teaching salaries and other expenses have been allocated to the courses involved, and the number of students enrolled and the number of clock hours or credit hours during the period covered by the cost data. In the case of new courses for which no actual cost experience is available, estimated costs may be submitted.
if: H* # ❖ #
(b) For institutions other than nonprofit for either courses of less than 30 weeks or courses of 30 weeks or more. Fair and reasonable compensation for schools operated for profit will not exceed the actual or estimated costs to the institution for providing the instruction, plus an allowance for profit as indicated below. In determining the fair and reasonable compensation all expenses, except expenses for sales commissions and promotional plans, which are reasonable and necessary for the operation of the courses involved will be included in the cost statement and such expenses will be grouped into the general categories set forth below within the limits designated.
(1) Actual cost of teaching and related personnel at reasonable salaries. Teaching and related personnel will include personnel essential to the teaching function such as laboratory supply room attendants and clerical personnel assisting teachers in the preparation of instructional material and records. The salaries of personnel serving both in administrative and teaching functions will be prorated accordingly. The cost shown for teaching personnel will be supported by a schedule listing the name, title, annual salary rate, and will show whether employment is part-time or full-time for each person included in such cost.
*120 (2} Consumable instructional supplies.
(3) Depreciation on building and equipment actually used for instruction of students at rates allowed by the Bureau of Internal Revenue for income tax purposes.
(41 Reasonable rent.
(5) Cost of heat, light, power, water, janitor service, and building maintenance.
(6) Taxes and insurance, exclusive of income taxes.
(7) Actual administrative expenses which are considered reasonable and necessary in the operation of the school and are properly allocable to the courses under review. Such expenses may include salaries of administrative and clerical personnel representing reasonable compensation for services actually performed and the cost of such items as postage, telephone and telegraph, travel, interest, legal and accounting fees for actual service (not retainers), stationery and office supplies, and such other similar expenses as are reasonable and necessary for the operation of the school, provided that in no case will there be included in the fair and reasonable cost determination a base salary in excess of the rate of $10,000 per annum for an individual who has a proprietary or bonus interest in the institution. The administrative cost must be itemized and the salary items must be supported by a statement showing for each person the name, title, annual salary, percentage of time devoted to administration, and the amount of salary allocated to the cost of the courses under review. All cases where requested administrative costs exceed 15 percent of subparagraphs (1), (2), (5), and (6) of this paragraph shall be forwarded to the Assistant Administrator for Vocational Rehabilitation and Education, central office, for review and approval.
(8) Advertising expense calculated in accordance with the procedure set forth below and not to exceed the limitations prescribed herein.
(i) Determination of amownt allowable for advertising expense. * * * Where the institution has not been established for a period of five years prior to June 22, 1944, and therefore does not have a fair standard of experience with relation to advertising costs prior to the enactment of Public Law 346, 78th Congress, as amended, the institution may be permitted to include advertising expense actually incurred during the period covered by the cost review in an amount not to exceed the average percent of gross income from resident instruction which other well-established comparable *121 schools in the area have expended for advertising for the five-year period immediately prior to June 22,1944. If there are no other comparable schools in the area and. if the institution does not have a five-year experience prior to June 22, 1944, the schools may be authorized to include actual advertising costs at a rate shown by their experience but not in an amount to exceed 8 percent of the total gross income from resident instruction for the period covered by the cost review without prior approval of Central Office. Where there are no other comparable well-established schools in the area and the actual advertising experience of the institution exceeds 8 percent of gross income from resident instruction, more than 8 percent may not be included in the fair and reasonable cost determination unless all facts are submitted to the Assistant Administrator for Yocational Eehabilitation and Education and approval is granted for the inclusion of advertising costs in excess of 8 percent. In no event will a newly established school, without actual cost experience for advertising expense, be permitted to include in a fair and reasonable cost statement, advertising expense in excess of 8 percent of gross income from tuition for resident instruction.
í|í # sjs
(9) Profit not to exceed 10 percent of the amount customarily charged to nonveteran students for the course. * * * If no nonveteran students are enrolled and there is therefore no real customary charge actually being paid by nonveteran students, the profit allowance will be determined as one-ninth (%th) of the total allowable costs included in subparagraphs (1) to (8) of this paragraph.
(10) Expenses for sales commissions and promotional plans will not be allowed.
(c) When the manager has completed Ms analysis of the cost data. When the manager has completed his analysis of the cost data, he will determine on the basis of the total number of all students trained and cost of the items listed herein after reflecting known changes in costs whether the customary charges of the educational or training institution are fair and reasonable. In making this determination, the manager will give consideration to the fact that it is not fair and reasonable for the Veterans’ Administration to pay a charge based on the full cost of operating an educational institution under abnormal situations, such as periods when enrollments in the institution are far below the normal capacity and expectancy of the institution, or *122 where operating costs are greatly in excess of normal operating costs for other comparable institutions in the same general locality. Contracts, when required, will be negotiated to provide (payment not to exceed the amounts determined by the manager to be fair and reasonable as provided herein.
7. Public Law 266, 81st Cong., 1st Sess., 68 Stat. 681, 653, approved August 24, 1949, provided with respect to the Veterans Administration in part as follows:
* * * Provided further, That no part of this appropriation for education and training under title II of the Servicemen’s Readjustment Act, as amended, shall be expended subsequent to the effective date of this Act for subsistence allowance or for tuition, fees, or other charges in any of the following situations:
* $ $ $ $
(2) For any course of education or training for which the educational or training institution involved has no customary cost of tuition, until a fair and reasonable rate of payment for tuition, fees, or other charges for such course has been determined. In any case in which one or more contracts providing a rate or rates of tuition have been executed for two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition notwithstanding the definition of “customary cost of tuition” as hereinafter set forth. If the Administrator finds that any institution has no customary cost of tuition he shall forthwith fix and pay or cause to be paid a fair and reasonable rate of payment for tuition, fees, and other charges for the courses offered by such institution. Any educational or training institution which is dissatisfied with a determination of a rate of payment for tuition, fees, or other charges under the foregoing provisions of this paragraph shall be entitled, upon application therefor, to a review of such determination (including the determination with respect to whether there is a customary cost of tuition) by a board to be known as the “Veterans’ Tuition Appeals Board” consisting of three members, appointed by the Administrator for such purpose. Such board shall be subject, in respect to appointment, hearings, appeals, and all other actions and qualifications, to the provisions of sections 5 to 11, inclusive, of the Administrative Procedure Act, approved June 11,1946, as amended. The decision of such board with respect to all matters shall constitute the *123 final administrative determination. In no event shall the board fix a rate of payment in excess of the maximum amount allowable under the Servicemen’s Readjustment Act, as amended. * * *
8. Public Law 610, 81st Cong., 2d Sess., 64 Stat. 336, 338, approved July 13,1950, provided, in part, as follows:
For any course of education or training for which the educational or training institution involved has no customary cost of tuition, a fair and reasonable rate of payment for tuition, fees, or other charges for such course shall be determined by the Administrator. In any case in which one or more contracts providing a rate or rates of tuition have been entered into in two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition notwithstanding the definition of “customary cost of tuition” as hereinbefore set forth. * * * If the Administrator finds that any institution has no customary cost of tuition he shall forthwith fix and pay or cause to be paid a fair and reasonable rate of payment for tuition, fees, and other charges for the courses offered by such institution. Any educational or training institution which is dissatisfied with a determination of a rate of payment for tuition, fees, or other charges under the foregoing provisions of this paragraph, or with any other action of the Administrator under the amendments made by the Veterans’ Education and Training Amendments of 1950, shall be entitled, upon application therefor, to a review of such determination or action (including the determination with respect to whether there is a customary cost of tuition) by a board to be known as the “Veterans’ Education Appeals Board” consisting of three members, appointed by the President. * * * The decision of such Board with respect to all matters shall constitute the final administrative determination. * * *
# # * # if;
Any educational or training institution which has a contract covering any period subsequent to August 24, 1949, shall be entitled to a review by the Veterans’ Education Appeals Board of the rate of tuition, fees and other charges established in such contract. Application for such review must be made within sixty days following the date of enactment of the Veterans’ Education and Training Amendments of 1950.
9. Plaintiff did not file an appeal with respect to any of its contracts to the Veterans’ Tuition Appeals Board. Such *124 Board was set up by Public Law 266. Plaintiff filed an appeal with the Veterans’ Education Appeals Board under Public Law 610 under date of June 24, 1952, with respect to supplements 1 and 5 to contract V3028V-1399, but failed to take any further action in the matter and the appeal was dismissed by the Board on September 29,1953, for lack of prosecution. The record does not establish that any appeals to the Veterans’ Education Appeals Board were filed under other contracts.

Contract No. V3028V-J¡98

10. Since the plaintiff school was established subsequent to June 22, 1944, and a majority of its students were veterans, plaintiff was not regarded as having established a customary cost of tuition under Public Law 346. Accordingly, pursuant to the regulation, Change 4, set out in finding 6, plaintiff submitted to the Veterans Administration Regional Office a cost-data statement for the 8-month period ending July 31, 1949, as a basis for the determination of a contract rate for the period December 1, 1948, through December 31,1949. Since the school had been recently established, a schedule of estimated costs as required by the regulation was submitted.
The Veterans Administration made several changes or adjustments in the cost data submitted by plaintiff. For instructional costs the school had claimed the amount of $40,425. Included in this total was the salary of a “director of instruction” at $4,375 per year. The contract officer learned that William Bridgeforth, who was listed as an instructor, also acted as the director of instruction. The salary for that position was accordingly eliminated as an unnecessary duplication. The salary of one instructor, in the amount of $2,100, was eliminated as being unnecessary for the number of instructional hours involved. The contract officer also transferred from administration to the category of instructional costs the salary of a stockroom attendant in the amount of $3,200. The revised total allowed for instructional costs was $37,150.
The school claimed $68,362.50 for consumable instructional supplies, of which $55,700 represented the cost of tool kits, plus salary of stockroom attendant of $3,200. These tool kits were not given outright to the students but could *125 be used by them during the period of instruction. Accordingly, the contract officer amortized the kits over a 5-year period in accordance with a schedule or procedure followed by the Bureau of Internal Revenue under similar circumstances. The amount allowed for consumable instructional supplies was $12,662.50.
The school claimed depreciation on its leasehold improvements over a 5-year period. However, pursuant to a schedule of depreciation followed by the Bureau of Internal Revenue, in comparable cases, the leasehold improvements were depreciated over a period of 10 years.
Pursuant to the limitations set out in Change 4, administrative expenses were limited to 15 percent of the sum of items 1, 2, 5, and 6 of section 21.530 of the regulation, Change 4, namely, instructional costs, consumable supplies, utilities, and taxes and insurance.
The tuition rate was determined upon the basis of 218,150 hours of instruction for the 8-month period ending July 31, 1949, with operating costs allowed as follows:
1. Instructional costs-$37,150. 00
2. Consumable instructional supplies_ 12, 662.50
3. Heat, light, power, water:
Heat and water_ 600. 00
Light and power_ 800. 00
Janitor service_ 3, 200. 00
Maintenance—
Building_ 800. 00
Equipment_
4. Taxes and insurance:
Taxes_ 2, 086. 00
Insurance _ 855.00
5. Subtotal_ 58,153. 50
6. Administrative costs- 8, 723. 03
7. Advertising- 4,900.00
8. Depreciation—
Building — Leasehold improvement_ 1,333.33
Equipment _ 2, 749. 90
9. Bent_ 4, 000. 00
10. Subtotal_ 79,859. 76
11. Net profit (allowable profit %Xitem 10)_ 8,873.31
12. Total_ 88, 733. 07
13. Student hours of instruction furnished_ 218,750
14. Cost per student hour- ^!ne _ $0.41
*126 It is not shown by the record that the rate of 41 cents per student hour established by the Veterans Administration was arbitrary, unfair, or unreasonable for contract No. V3028V-498.[14]

Contract No. V3088V-1067

11. At the conclusion of contract V3028V-498, plaintiff submitted to the Veterans Administration a cost-data statement covering the period December 6, 1948, to December 5, 1949, as the basis for the determination of the tuition rate for a contract covering the period January 1, 1950, to December 31,1950.
Since this statement covered alleged actual costs, the Veterans Administration contract officer personally visited the school and made an audit of its records. Actual salaries were checked with the individual payroll cards and the withholding statements (W-2) of each person involved. Consumable instructional supplies were verified by an actual audit of the invoices and a spot check of the cancelled checks. With respect to utilities, taxes and insurance, and advertising, the contract officer examined vouchers, invoices, and cancelled checks. Depreciation of equipment was determined on the basis of a personal check of the supply vouchers.
12. The contract officer made revisions or adjustments with respect to the cost data as reflected under various headings as follows:[15]
a. Instructional Costs.
The school originally claimed $60,628 as teaching salaries *127 and $12,929.51 as related salaries. On March 20, 1950, the .school sent a letter to the Veterans Administration containing an amended schedule which substantially modified the salaries shown on the cost-data statement. The audit made hy the contract officer of the payroll cards and withholding statements showed that the amounts paid for teaching ¡salaries and related salaries were $38,084.21 and $6,243.47, respectively, and these amounts were allowed for a total of :$44,327.68. Plaintiff’s proof has not established that these .amounts as found by the contract officer are incorrect.
b. Traveling Expense for Instructors.
Plaintiff claimed $517.63 as traveling expense for instructors. This item was disallowed on the basis that such •costs were not shown to have been incurred as necessary expense in the performance of the instructors’ official duties. Plaintiff has not shown that such disallowance was improper.
c. Consumable Supplies.
The cost-data statement included a claim for a total of $24,299.57 for consumable supplies. In his audit of the .school’s records the contract officer examined each invoice and had an opportunity to determine the character of the item involved. He concluded that a substantial portion of the purchases claimed as consumable supplies was not the type of supplies that could or would normally be consumed during the cost-data period. He accordingly determined that some of these supplies should be amortized. The following categories were reclassified to depreciable accounts:
Shop tools and tool sets_$2,162.69
Shop equipment_ 7, 279. 86
Leasehold improvements- 1, 270.07
•Office equipment- 1, 236.02
Olassroom equipment_ 691.66
Total_ 12,640. 30
Some items were omitted or disallowed because there were no supporting invoices or the invoices showed that certain purchases had been made outside the cost-data period •involved.
The total amount allowed for consumable supplies was $11,530.36. The contract officer’s finding was adequately sup *128 ported. No proper basis bas been shown by plaintiff’s proof for any increase in this allowance for consumable supplies.
d. Textbooks.
The cost-data statement made no claim for textbooks but, as a result of bis audit, the contract officer allowed $2,431.60 for this item.
e. Utilities — Heat, Light, Power, etc.
The amounts found for beat, water, light, and power were allowed as claimed by the school. The cost-data statement claimed $7,200 for janitors’ salaries but, as a result of an audit of the payroll records, the amount allowed was increased to $7,890. The school claimed $3,798.10 for building maintenance and $152.23 for equipment maintenance. These items, however, were not broken down in detail in the cost-data statement. They were apparently included in the consumable supplies schedule. The contract officer, as a result of his audit of the consumable supplies, allowed $1,860.55 for building maintenance and disallowed the $152.23 for equipment maintenance because there were no records to support that claim.
The allowances of the contract officer made under this subheading are adequately supported.
f. Taxes and Insurance.
Taxes and insurance were allowed as claimed in the cost-data statement except for one $300 tax item which had been listed simply as “personal (estimated) ” without any explanation being made by means of plaintiff’s records or oral testimony. This disallowance was proper.
g. Administrative Expense.
The cost-data statement claimed the sum of $22,851.66 as administrative expense. The contract officer, in accordance with the applicable regulation, Change 4, limited administrative expenses to 15 percent of items 1, 2, 5, and 6 of section 21.530 of the regulation, namely, instruction costs, consumable supplies, utilities, and taxes and insurance. The amount so calculated is $10,928.17.
h. Advertising.
In its cost data the school claimed as advertising expense the following:
*129 Newspapers_ $549. 05
Brochures, circulars, pamphlets_ 878. 75
“Traveling Expenses of Joe Louis for traveling purposes to advertise the school”_ 6, 526. 83
Total_ 7,954.13
Tlie contract officer disallowed the $6,526.33 claimed for Joe Louis’ traveling expenses on the ground that this represented promotional activities which were not a reasonable advertising expense within the purview of the applicable regulation. Joe Louis made frequent trips in the South, during which he would address veterans’ organizations and other groups for the purpose of recruiting students for the school. Usually these trips were made in conjunction with other interests and activities, which included golf tournaments, etc. There is no way, based upon plaintiff’s proof, to compute or allocate to cost-data schedules any specific amount or percentage of this claimed item.
While there is no limit to the amount that a business enterprise can spend on advertising or promotion if the money is available, whether the Veterans Administration should be compelled to underwrite the expenditure (that is, whether the amount spent by a school should be included in the base figure upon which a fair and reasonable rate is determined) depends on whether the expenditure claimed represents a normal or reasonable expenditure under the usual or generally accepted method of advertising for the class of business involved.[16] A trade school generally confines its advertising to newspapers, magazines, and trade journals. It is not a normal or usual practice, or generally accepted, for a school to engage the former world’s heavyweight boxing champion to advertise such school while traveling about the country on other engagements. Although it appears that the contract officer, on the basis of the record, properly disallowed the traveling expenses of Joe Louis, it should be noted that he allowed two rather substantial items not claimed by plaintiff, namely, $891.67 for a *130 sign and an additional amount of $319.13 for newspaper advertising.
Tbe amount of advertising allowed was $2,638.82.
i. Depreciation.
Tbe school claimed depreciation as follows:
Leasehold improvements-$4, 000.00
Leasehold improvements- 1, 026.66
Shop equipment_ 1, 841. 60
Classroom equipment- 208. 25
Shop cars- 575. 98
Office furniture and fixtures- 151.49
Total_ 7, 803.98
Tbe contract officer made adjustments as follows, which were allowed by the Veterans Administration:
Shop equipment_$1, 841. 60
Classroom equipment- 208.25
Office furniture and fixtures — transferred to administrative expense, $151.49_
Shop cars — These cars were found to be personal cars; therefore the full amount claimed for depreciation of $575,98 was disallowed--
Leasehold improvements, $4,000.00. School used 20% rate — spread over 5-year lease. VA amortized over 10-year period resulting in a disallowance of $2,000.00- 2, 000. 00
Leasehold improvements, $1,026.66. School used 33%% rate — spread over 3-year lease. VA amortized over 10-year period resulting in a disallowance of $718.66_ 308. 00
Amortization at 10% of amount transferred from consumable supplies by VA- 127.07
Total_ 4,484.92
The depreciation periods adopted by the contract officer were determined on the basis of schedules followed by the Internal Revenue Service. Plaintiff has not attempted to impeach the adjustments made by the contract officer in the decreased depreciation amounts used, and his determination is adequately supported,
j. Rent.
Rent was allowed in the amount of $10,000, which the plaintiff admitted was the correct figure.
*131 The tuition rate for contract 1067, which was calculated by dividing the allowable costs by the number of student hours, was arrived at as follows:
Instructional costs_ $44,327. 68
Consumable supplies. 11, 530.36
Textbooks_ 2,431. 60
Utilities_ 12, 086.79
Taxes_ 1,828. 55
Insurance _ 649. 50
Subtotal_ 72,854.48
Administrative expense___[17]10, 928; 17
Advertising _ 2, 638. 82
Depreciation _ 4, 484. 92
Bent_$10, 000.00
Subtotal _ 100, 906. 39
Profit=% of subtotal_[18] 11,211. 82
Total allowable costs_112,118.21
Student hours of instruction furnished_ 296,250
Tuition rate per hour_ $0.37846
13. The contract officer’s determination of the rate reflects a thorough and detailed analysis of the school’s costs in the categories allowed by the regulation, based on a personal audit of the school’s records at the timé the cost data was submitted. This contract was considered by the Veterans Administration as being of particular importance since it was the second of a series of contracts and would accordingly become the frozen rate for future similar contracts.
Plaintiff did not attempt to attack the specific adjustments made in the claimed amounts of the cost data by the contract officer in various categories of expenses set out in the applicable regulation during the period of the trial. On the theory that it was entitled to a cost-plus contract, plaintiff has attempted to prove what its total costs were during the cost-data period (December 6,1948, to December 5,1949). A full set of books of accounts which may have been originally *132 maintained by tbe school was not available at the time of the trial. The plaintiff made a laborious and determined effort to reconstruct such records from cancelled checks, bank statements, etc., many of which were not supported by vouchers so that it was necessary to make inferences as to the purpose of the payments. To establish the school’s costs plaintiff called as a witness Mrs. Frances Loman, who had prior bookkeeping and accounting experience but had never been employed by the school and had no personal knowledge of its operations or expenditures. She admitted, for example, that she could not tell whether an invoice, represented a consumable supply or one which had to be amortized. (Apparently plaintiff did not attempt to base any of its requested findings on the testimony of Mrs. Loman). The cost-data statement had actually been prepared by Theodore A. Jones, a certified public accountant, who had been vice president and treasurer of the plaintiff school. Although Mr. Jones was available and actually appeared briefly as a witness, he was not asked to testify with respect to the reconstruction of the school records or to explain expenditures which could not be verified from original vouchers or to impeach the adjustments made by the contract officer in his analysis of the cost data on which the tuition rate was based.
The audit conducted by the Veterans Administration contract officer at the time the cost-data statement was filed in 1950 was made when all the records were available. There is no satisfactory evidence to establish that his audit was inaccurate or his adjustments unreasonable or that they were not made in accordance with the applicable regulation. Based upon all the evidence reviewed, it has been found by defendant that a rate of $0.37846 per student hour is fair and reasonable in accordance with Veterans Administration Regulation, Change 4, and that such a rate is supported by adequate evidence. Such determinations are supported by the record now before the court.
14. On May 19, 1950, the Veterans Administration Regional Office mailed to the school copies of the proposed contract 1067 embodying the tuition rate of $0.37846. The letter of transmittal read in part as follows:
*133 We are enclosing 6 completed copies of a proposed contract with your institution.
It is noted that the new rate is lower than that for the previous contract period. This rate was arrived at in accordance with the provisions of paragraph 80b of Veterans Administration Manual M7-5, and was in line with the adjustments, allocations, allowances and dis-allowances of various elements of your cost data discussed with you in the process of arriving at the fair and reasonable rate for the period January 1, 1950 through December 31,1950.
If your institution is dissatisfied with this rate advise this office at once and the necessary forms required to be filed with the Veterans Tuition Appeals Board, Veterans Administration, Washington 25, D.C., will be forwarded to you.
If the rate is satisfactory to you, as you have indicated, sign all copies and return them to this office for final signature. * * *
On the following day, May 20, 1950, the contract was signed by Truman K. Gibson, Jr., as secretary, and Theodore A. Jones, as vice president and treasurer, of plaintiff school. No written protest or objection to the rate was made by the school, nor was any appeal taken to the Veterans’ Tuition Appeals Board, which was established under Public Law 266,81st Congress. Mr. Gibson, who is an attorney, acknowledged that he was aware that such a Board existed to hear appeals from rates fixed by the Veterans Administration. At the time the contract was signed, the Veterans Administration regulation (Instruction 1, issued September 8, 1949, pursuant to Public Law 266, 81st Congress) read in pertinent part as follows:
d. Payment. Authorized Pending Action of Appeals Board. Upon receipt by the regional office of the notice of intent to appeal, the regional office will insert in the proposed contract a clause which is authorized for use in such cases, reading as follows: “The execution of this contract shall be without prejudice to the (name of institution) to appeal to the Veterans’ Tuition Appeals Board the question of existence of customary costs or of fair and reasonable rates; and the contact shall be subject to any revision made by said board pursuant to the governing statutes and regulations”. The proposed contract will then be submitted immediately to the educational institution for signature and the educational *134 institution will be informed that the YA will make payment under such contract at the determined fair and reasonable rates pending final action by the appeals hoard. If an institution declines to execute the contract and files an appeal, the rates determined by the VA will be payable subject to action by the board. Where a fair and reasonable rate offered by the VA for the most recent contract period which completes the second successive year is appealed by the educational institution, the rate determined by the Veterans’ Tuition Appeals Board will establish the final rate for the contract and such contract rate will become the customary cost of tuition.
This regulation would have permitted the school to receive tuition payments pending the appeal to the Veterans’ Tuition Appeals Board.
Pursuant to the saving clause of Public Law 610, 81st Congress,[19] the plaintiff could also have appealed to the Veterans’ Education Appeals Board within 60 days of the enactment of the statute on July 13, 1950. Public Law 610 further provided that:
* * * [D] wring negotiations for a contract, and during the pendency of any appeal which a school may make, the Veterans’ Administration shall continue to make further payments to the school in such amount as the Administrator considers to be “fair and reasonable,” but not less than 75 per centum of the most recent rate paid to the school.
No appeal to the Veterans’ Education Appeals Board was taken by plaintiff with respect to contract V3028V-1067.

Contracts V3028V-1399 and V3028V-1822

15. Contract V3028V-1067 was the second in the sequence of contracts and, under Public Law 610, its tuition rate became the “frozen,” or customary cost of tuition to be in *135 corporated automatically in all similar future contracts without consideration of any further cost data.[20]
The contract rate of $0.37846 for the automotive course was incorporated in contract Y3028Y-1399 covering the period January 1, 1951, to December 31, 1951, and subsequently in contract V3028V-1822 covering the period January 1,1952, to December 31,1952.
Both contracts were accepted by plaintiff without protest and neither was appealed to the Veterans’ Education Appeals Board.

Supplement 1 to Contract No. V3088V-1899

16. In January 1951 plaintiff instituted a new course in electric arc and oxyacetylene welding. Since plaintiff could have no customary cost of tuition for a new course, the Veterans Administration was required, under Public Law 610, to fix a fair and reasonable rate. In the case of a new course it was necessary, in accordance with the regulation, Change 4, to base the rate on estimated costs. The new course was 20 weeks in length; it was given in the same building as the automotive course and utilized a portion of its facilities. The Regional Office described in detail the method which it used in fixing the rate in a letter dated May 31, 1951, addressed to the Veterans Administration Area Office in St. Paul, Minnesota, which had supervisory jurisdiction over the Chicago Regional Office. The letter read in part as follows:
5. Teaching and related personnel salaries. The supplementary information submitted by the school in its attached letter of May 22,1951, shows that one instructor was assigned full time to the new Welding course at a salary of $2,500.00 for the period, another instructor being assigned to replace him in the Body and Fender Repair Division. An additional instructor was employed to instruct the Welding course beginning April 16, 1951, at a salary of $812.50 during the six and one- *136 half weeks period. The total allowed teaching cost of $3312.50 was considered as allocable to the new course for teaching salaries, since it is an expense which would not have been incurred had the new course not been added. The salary of $875.00 claimed for an attendance and record clerk was not allowed, since it was considered that this amount was more properly allocable to Administrative Expense already allowed for courses in the basic contract.
6. The total teaching cost of $3,312.50 figures to .2208 per hour, less .1496 allowed in the basic contract equals .0712 additional allowed per hour for the new course. This .07 per hour increase is due in part to higher wage cost of more highly skilled teaching personnel required for the new course, and a union wage increase since the period of the basic cost data, plus the fact that the student ratio for the new course, per authorization of the State approval agency, is 1 to 15 compared to 1 to 20 for the old courses, which in itself would result in an approximate 25% increase in the hourly cost.
7. Consumable instructional supplies of $5,529.00 is shown in the school’s supplementary letter of May 22, 1951. The amount of $5,000.00 was allowed as a more reasonable figure for this course and more comparable to the experience of other schools in this area for similar instruction. The resulting cost per hour is .3333, less .0389 allowed in the basic courses, or a net of .2944 per hour allowed for the new course. This represents a more accurate estimate than one previously arrived at, since it is based upon more actual experience during the period of the course.
8. Depreciation on buildings and equipment. Additional equipment and machinery purchased because of this course were shown as $6,482.90. Leasehold improvements directly due to the new course amounted to $1,841.60, for a total of $8,324.50. Depreciation was allowed on a five-year basis for the twenty-week period. ($8,324.50 divided by 5) X (20/52) equals $640.34. This equals .0426 per hour, less .0233 allowed for the basic course, or a net allowed of .0193 per hour for the new course. This additional depreciation rate is based on two factors: (a) the new course required a higher per capita or per student hour of instruction investment in necessary machinery and equipment, and (b) because of type and use of equipment for this particular course, it is depreciated over a shorter period of time.
9. No additional cost for rent was allowed, since no additional space was required for the new course.
*137 10. School claimed no additional cost for heat, light, janitor service and building maintenance. However, claim was made for additional electric power and water services required for the new course in a claimed amount of $100.00 per month or $500.00 for the course. $300.00 was allowed as a reasonably additional cost, since it is recognized that a much larger amount of electricity and water is consumed in the process of instruction in this type of course. This figures to an additional .0200 per hour.
11. No additional costs for taxes and insurance were allowed for the new course.
12. No additional administrative expense was allowed, although it is noted that application of the formula which was used in the basic contract would have permitted additional allowance for administrative expense.
13. School claimed additional advertising expense of $1,000.00 directly due to the new course. $640.60 was allowed on the basis of invoices for Advertising presented by the school. This equaled .0427 per hour, less .0089 allowed in the basic courses, or a net allowed for the new course of .0338 per hour. This additional cost is due to the fact that, as a new course, more extensive advertising was required than for the older established courses. It is noted that this rate is considerably below the formula rate.
14. The new rate thus developed for the Electric Arc and Oxy-Acetylene Welding course is .8659 per hour. This compares with the rate for similar courses of .89 of the A&S Vocational Welding School, and .92 of the Greer Shop Training School, both old established schools in the Chicago area. The difference between the rate of the basic course and the new course is due to additional expense directly allocable to the new course for reasons set forth above.
17. The rate of $0.8659 per student hour was incorporated in supplement 1 to contract V3028V-1399 covering the period January 15, 1951, to June 15, 1951. It was accepted without protest by the school. However, on June 24, 1952, the reasonableness of the tuition rate was appealed to the Veterans’ Education Appeals Board. Plaintiff took no further action in the matter, and on September 29, 1953, the Board dismissed the appeal for lack of prosecution.
.18. An analysis of the adjustments made by the contracting officer discloses that, with two exceptions, they are acceptable as fair and reasonable. They were arrived at *138 through a tedious and painstaking review of incomplete and . inadequate records. However, he did not allow the school any additional costs for increase in taxes and insurance under supplement 1 nor did he allow an additional amount for administrative expenses, although he stated that the basic contract formula would have permitted such an allowance. It is fair and reasonable to include as a part of the costs of the school the estimate of $400 for additional taxes and insurance attributable to the new course and allow administrative expenses to the extent of 15 percent of the allowable costs .properly attributable to the new course.
This would result in a tuition rate of $0.9491, computed as follows:

19. The revised rate shown in finding 18 is deemed to be fair and reasonable. Plaintiff is entitled to additional income for instruction of veteran students by the school in the amount of $1,549.01, computed as follows:
Student hours of instruction (actual) Income
18,618 [21]. $17,670.34
18,618-16,121.33
Difference.. 1,549.01
*139 Supplement 5 to Contract V3028V-1399 -
20. Upon the conclusion of supplement 1 ■ to contract V3028V-1399, plaintiff submitted cost data as a basis for the determination of a fair and reasonable rate for a renewal of the contract for the electric arc and welding course. The cost data covered the period January 15, 1951, to June 15, 1951. The contract officer made a personal audit of the school’s records, examining payroll records, cancelled checks, and invoices.
21. The school, in its cost data, claimed total costs during the period January 15, 1951, to June 15,1951, of $20,999.24. After adjustments, the contract officer allowed a total of $19,627. His analysis of the cost data was reported in great. detail.
Principal adjustments made consisted in allocating what was deemed to be the proper percentage of total costs claimed by the school to the welding course which utilized the facilities of the automotive school. In some categories, one-third of the cost was allocated to the welding course; in others, one-half.
The contract officer also made an adjustment for student hours of instruction. The school claimed 18,618 hours of instruction during the cost-data period. The contract officer projected this figure to 20,842 hours, on the ground that the actual instruction hours represented were below normal capacity. An adjustment of the enrollment factor to accord with the amount computed to be reasonable for the efficient use of the available facilities of the school was standard practice when the provisions of Veterans Administration' Regulation, Change 4, Section (c), were applicable. Section (c) provides, in part, as follows:
* * * In making this determination, the manager will give consideration to the fact that it is not fair and reasonable for the Veterans’ Administration to pay a charge based on the full cost of operating an educational institution under abnormal situations, such as periods when enrollments in the institution are far below the normal capacity and expectancy of the institution * * *
The tuition rate for supplement 5 to contract 1399 was computed by defendant as follows:
*140 Teaching and related personal-$5,512.38
Consumable instructional supplies- 7, 603.03
Depreciation on buildings and equipment- 186.12
Depreciation of leaseholds and rent- 1,152. 42
Heat, light, power, water, janitor service, building maintenance- 1,479.25
Taxes and insurance- 388.91
Administrative expense- 2,247. 54
Advertising expense for welding only- 1,057.35
Subtotal_ 19,627. 00
Profit (1/9 of above items)- 2,180.77
Total cost_ 21, 807. 77
Student hours- 20, 842
Rate per student hour- $1.0463
The tuition rate of $1.0463 was incorporated in supplement 5 to contract 1399. This contract was accepted by the school without protest. On June 24,1952, the reasonableness of the tuition rate was appealed to the Veterans’ Education Appeals Board. However, as in the case of supplement 1, plaintiff took no further action in the matter, and on September 29, 1953, the Board dismissed the appeal for lack of prosecution.
22. In this instance the facts do not support a finding that the enrollment of the school was “far below the normal capacity and expectancy of the institution.” Accordingly, the projection of students hours of instruction from actual hours of 18,618 to a figure of 20,842 hours, on the basis that the actual hours were far below normal, was unwarranted and not supported by the record. Defendant offered no adequate evidence to establish that the actual number of hours was abnormal or “far below the normal capacity and expectancy of the intitution.”
It is therefore concluded that, although the contracting officer made many fair and reasonable adjustments, he should have computed the tuition rate on the basis of actual hours, rather than on the projected figure used. A fair and reasonable determination would have resulted in a rate of $1.1713 per hour, arrived at by using the following figures:
Allowable costs-$19, 627
Actual hours_ IS, 618
Computed rate_$1.1713
Allowed rate_ 1. 0463
Difference_ 0.1250
$0.1250 X18,61S=$2,318.25
*141 The amount due plaintiff under supplement 5 should be increased as shown.
23. Contract V3028V-1067 provided that students would be automatically interrupted upon three consecutive or four nonconsecutive days’ absences in any given month. Absences in excess of two and a half days per month would be considered excess absences. A total of five tardinesses would constitute a full day’s absence. A total of eight excess absences in a course would cause automatic interruption of training.
Contract V3028V-1399 and supplements thereto provided for the period January 1,1951, to April 30,1951, an absence policy as stated above for contract 1067. For the period May 1, 1951, to June 30, 1951, maximum allowable absences were limited to 20 hours for the 875-hour course in automobile mechanics and body and fender repair and to 12 hours for the welding course. It provided that the Veterans Administration would not pay for make-up time where absences were in excess of the number allowable. A student who was late three times in any one month would be charged with one day of absence. For the period July 1, 1951, to December 31,1951, the contract provided for maximum total allowable absences of three days in any one month for the automobile mechanics and body and fender repair and welding courses. The contract provided that the Veterans Administration would not pay for make-up time where absences were in excess of the number allowable.
Contract V3028V-1822 provided for 2.8 days’ maximum allowable absences per month and provided that a student who was late three times in one month would be charged with one day’s absence.
24. During the period February 26,1952, to May 14,1952, the Veterans Administration made an audit of the school’s records for the period December 1, 1948, to April 11, 1952, to determine whether there had been excessive absences. The audit revealed that as a result of excessive absences overpayments of tuition had been made to the school in the amount of $22,865.97. The school made certain objections to the audit made by the Veterans Administration but admitted that the total of overpayments due to excessive ab *142 sences amounted to $5,432.51. As a result of the objections made by the school, the Veterans Administration made a recheck of the school’s records and allowed the school a credit of $1,444.82.
Based upon the record at the time of the trial and prior thereto, it is found that neither party has satisfactorily established the amount due on defendant’s counterclaim because of overpayments resulting from excessive absences. Defendant’s answer, filed June 19, 1959, included a counterclaim in the amount of $12,703.18. It appears that this amount was arrived at by deducting $10,162.79, the amount subsequently recouped by the defendant, from the initial amount of $22,865.97. If we subtract plaintiff’s credit of $1,444.82, determined by defendant’s re-audit or re-analysis of the record, the balance allegedly due defendant under the counterclaim is reduced to $11,258.36. This is the amount which was referred to the General Accounting Office in 1954 as being due from the school to the Veterans Administration.-
With respect to defendant’s counterclaim, it should be pointed out that we have two separate audits which the respective parties insist are accurate, although there is a substantial difference in the amounts arrived at by such audits. There is no proper basis in the record for determining the accuracy of either audit because the time and attendance records are not in evidence and have apparently been lost or destroyed. Defendant has found a basis in the school records for revising its original figure downward, and this reduction has been made. Plaintiff has agreed to an overpayment in the amount of $5,432.51. In the circumstances it is reasonable and proper to limit the defendant’s counterclaim to no more than the amount of $5,432.51, the highest figure concerning which there is no disagreement.
25. Computations set out in preceding findings with respect to supplements to contract V3028V-1399 are summarized as follows:
Amount due plaintiff:
Supplement 1- $1, 549. 01
Supplement 5_ 2, 318.25
Total amount due plaintiff_ $3,867. 26
Amount due defendant (counterclaim)_ 5,432. 51
*143 The amount which might otherwise be due plaintiff, as shown above, is fully set off by plaintiff’s having received overpay-ments from the Veterans Administration, as shown above.
26. Plaintiff has not shown that it would have made any profit if its school had remained open, nor has plaintiff shown that any illegal, improper, or oppressive action of defendant caused plaintiff to fail to make a profit or to lose money.

 Since the resolution was adopted, the petition filed, and the testimony taken prior to the Supreme Court’s ruling in (Hidden Co. v. Zdanok, 370 U.S. 530 (1962), we think it proper to file this report without reference to the Supreme Court’s opinions in that case.

 Act of August 24, 1949, Public Law 266, 63 Stat. 631, 652-55; Act of July 13, 1950, Public Law 610, 64 Stat. 336.

 Plaintiff’s school had been approved for training veterans by the State of Illinois and was therefore eligible under the Readjustment Act.

 Manual 7-5 contains the controlling agency regulations.

 13 P.R. 2695 et. seq., codified with slight modification, 38 C.E.R. §§ 21.530, 21.570 (1949).

 It also applied to schools which unreasonably increased tuition charges. ’That portion of the regulation is not involved here.

 Under Public Law 266, an appeal with respect to tuition rates could be taken to the Veterans* Tuition Appeals Board, a three-member board appointed by the VA Administrator. Public Law 610, 64 Stat. 336, 339 (1950), made some changes by permitting, in addition, review of “any action of the [VA] Administrator” by a new three-member board (replacing the other) which was appointed by the President and called the Veterans* Education Appeals Board. A decision of these boards, during the time of their existence, constituted the “final administrative determination.’*

 With respect to Supplements 1 and 5 to Contract V3028V-1399, the Commissioner did find plaintiff entitled to some small amounts, as well as a sum owed but withheld by defendant. These were fully set off by over-payments made to plaintiff by the VA for which defendant counterclaimed. On balance, the Commissioner reported a small sum owed not to plaintiff but to defendant. On oral argument, however, the Government stated that it was pressing its counterclaim only to the extent it would preclude a recommended award for plaintiff. We, therefore, consider the counterclaim only to that extent.

 The cost data submitted for this contract covered the period from December 6, 1948 to December 5, 1949 (within the time of the first contract).

 Claims of depreciation have already been treated, supra, with respect to the first contract. They are no different for the second contract.

 Plaintiff’s other contentions with respect to the second contract are likewise unsound.

 These were payments which should not have been made under the contracts because of excessive absences by students.

 Plaintiff also claims the difference between the amounts paid to it and just compensation under the Eifth Amendment. If there is a difference, in the present circumstances, between “just compensation” and “fair and reasonable compensation,” the claimant has failed to point it out. Cf. United States v. Commodities Trading Corp., 339 U.S. 121 (1950). In any event, we do not think plaintiff entitled to more than the fair and reasonable compensation provided for in the applicable statutes and regulations. Just compensation, in the constitutional sense, is reserved for “takings” of private property. That is not the case here. Plaintiff was free to contract or not, knowing full well the terms and conditions to which it would be bound.

 Plaintiff did not attack any of the adjustments made by the contract officer in the cost schedule as submitted by the school. Mr. Colvin Roberts, president of the school, testified that William Bridgeforth was in charge of the teachers and practically ran the professional aspects of the school’s operation since none of the officers was an educator. The need for a separate director of education is not apparent. The tool kits were not given outright to the students and no claim was made for them in the cost data for contract 1078 covering the same period. The 15 percent limitation on administrative costs was standard in all Regional Offices and was the formula adopted by this court in B. & S. Lenow Trade School, Inc. v. United States, 145 Ct. Cl. 723 (1959). The rate of 41 cents was 4 cents above that granted in contract 1078 which was based on actual costs covering the same cost-data period.

The cost-data statement is in evidence as defendant’s exhibit 9. The analysis and adjustments to the cost-data statement made by Mr. Shapin, the Veterans Administration contract officer, are set out in defendant’s exhibit 10.

 <■* * * in a going concern where a consistent policy is pursued, advertising expense paid during a fiscal period will usually represent the normal cost for this class of expense. * * *” Field School of Upholstery and Allied Trades, Inc. v. United States, 141 Ct. Cl. 807, 837 (1958).

 The first six items total $72,854.48; 15 percent of that equals $10,928.17.

 The regulation, Change 4, provides in subparagraph 9: “4 * * If no non-veteran students are enrolled and there is therefore no real customary charge actually being paid by nonveteran students, the profit allowance will be determined as one-ninth (%th) of the total allowable costs included in subpara-graphs (1) to (8) of this paragraph.”

 “Any educational or training institution which has a contract covering any period subsequent to August 24, 1949, shall be entitled to a review by the Veterans’ Education Appeals Board of the rate of tuition, fees and, other charges established in such contract. Application for such review must be made within sixty days following the date of enactment of the Veterans’ Education and Training Amendments of 1950.”

“*** In any case in which one or more contracts providing a rate or rates of tuition have been executed for two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition notwithstanding the definition of ‘customary cost of tuition’ as hereinafter set forth. * * *” (Public Law 266, 81st Cong, (finding 7¡) ; Public Law 610, 81st Cong, (finding 8).)

 Defendent's witness testified that his audit of the school's records disclosed only 18,270 student hours. Use of that figure would slightly increase the amount due plaintiff. Plaintiff claimed 18,618 hours, and that figure has been adopted.